### BROOKS v. LIVERPOOL & LONDON & GLOBE INS. CO.*
### No. 4343.

Court of Appeal of Louisiana. Second Circuit.
Dec. 16, 1932.

St. Clair Adams and St. Clair Adams, Jr., both of New Orleans, for appellant.

Warren Hunt, of Rayville, for appellee.

DREW, J.

This suit involves five insurance policies. Five separate suits were filed and were consolidated for trial.

Plaintiff, the owner of a large frame building in the heart of the business district of the

---

*Rehearing denied January 19, 1933.

town of Winnsboro, La., obtained two policies of insurance on February 11, 1930; one with the City of New York Insurance Company, whose agent at Winnsboro was the Lowery Insurance Agency, and one with the Ætna Insurance Company, whose agent at Winnsboro was B. S. Landis & Co. Each of these policies insured the frame building above described for $300, and the meat market and restaurant, furniture, and fixtures of every description while contained in the building for $200. Each of these policies allowed additional insurance on the building of $900, and on the furniture and fixtures of $600.

On March 25th and 28th, respectively, the same two agencies issued similar policies in the Liverpool & London & Globe Insurance Company and the United States Fire Insurance Company. The amount in each of these two policies was $300 on the building, and $200 on the furniture and fixtures, and each policy allowed additional insurance of $900 on the building and $600 on the furniture and fixtures. The four policies aggregated $1,200 on the building, and $800 on the furniture and fixtures, the exact amount of insurance allowed by each policy.

On September 24, 1930, plaintiff secured an additional policy for $450, covering additional fixtures bought and put in the building. This policy was issued by the Mercantile Insurance Company of America. This policy was secured after plaintiff had moved some new equipment into the building for the installation of a laundry, and equipment that was not in the building when plaintiff secured the first four policies.

On October 12, 1930, the building, together with the furniture and fixtures therein, was destroyed by fire. Necessary proof of the fire and loss was made by the insured, and all companies refused payment. On August 2, 1931, plaintiff instituted suit on the first four policies issued, and on October 10, 1931, instituted suit on the policy last issued. On September 15, 1931, defendants in the first four suits answered, and on October 27, 1931, answer was filed in the fifth suit. On October 10, 1931, exceptions of no cause of action and no right of action were filed in the last-named suit, and on January 20, 1932, exceptions of no cause of action and no right of action were filed in the first four suits.

The defense set up in the answers is: (1) That plaintiff either burned the building himself or caused some one else to burn it; (2) that the furniture and fixtures were not of the value claimed by plaintiff, and the claim made by plaintiff was so unreasonable as to warrant the inference that it was fraudulent; (3) that plaintiff violated the clause in the policy providing against additional insurance, in that he secured $450 additional insurance on the property, above the amount allowed by the policy, without insurer's consent; (4) that several items cov-

ered by the insurance were covered by a chattel mortgage and not known to the defendants; and (5) that no penalties or attorney's fees are due if plaintiff recovers.

The exceptions of no cause of action and no right of action were overruled, and judgment awarded plaintiff in each suit in the amount sued for, plus 12 per cent. damages, as penalties, and $100 attorney's fees in each case. Defendants have appealed.

The policies issued by the Liverpool & London & Globe Insurance Company and the City of New York Insurance Company contain the following loss payable clause: "It is agreed that any loss or damage ascertained and proved to be due to the assured under this policy, shall be held payable to T. E. Drexler, as interest may appear: subject, however, to all the terms and conditions of this policy."

■ We find no such loss payable clause in the other three policies. This loss payable clause is what the exceptions of no right and no cause of action are based upon, defendants contending that, under said clause, plaintiff was without right to sue, and only T. E. Drexler could bring the suit. Since there is no loss payable clause in the cases of plaintiff against the Ætna Insurance Company, United States Fire Insurance Company, and Mercantile Insurance Company of America, the exceptions in these last three suits were properly overruled. This loss payable clause did not change the contract as between the insurance company and the insured. Under policies containing such a clause, the contract remains one exclusively between the insurer and the property owner, and therefore the property owner is the proper party to institute suit under said policies. Officer v. American Eagle Fire Insurance Co., 175 La. 581, 143 So. 500, 502.

This is the last expression of the Supreme Court of this state on this question, and involves a policy of insurance with a similar loss payable clause, as in the case at bar. It reviews the decisions of the courts of this and many other jurisdictions, and is decisive of the question raised by defendants under their exceptions of no right and no cause of action.

"This policy was in no sense a contract between the insurer and the mortgagee. The assured owned the property covered and controlled it. He consented that in case of loss or damage to his property by fire a portion of the proceeds of the policy should be paid by the insurer to the mortgagee, as his interest might appear. This provision in the policy did not constitute the mortgagee 'virtually the assured,' as was held by the Court of Appeal.

"The clause in this policy making the proceeds, if any, payable to the mortgagee, as his interest might appear, is what is generally

referred to as an ordinary or open mortgage payable clause, under which the assured mortgagor remains the responsible party, or party in interest, to control the insurance and the adjustment of the loss. Under policies containing such a clause, the contract remains one exclusively between the insurer and the property owner. The mortgagee is only a conditional appointee of the mortgagor. to receive part of the proceeds in case of loss. As such conditional appointee, the mortgagee was entitled to receive so much of any sum that might become due under the policy as did not exceed his interest as mortgagee, and no more."

We therefore find that the exceptions of no right of action and no cause of action were properly overruled.

■■ The first defense set up by defendants is that plaintiff either set fire to the building or procured some one else to do so. We realize fully that a defense of arson in a civil suit does not have to be proved with the same certainty as in the prosecution for arson in a criminal suit, but the law does require that the defendant who sets up arson as a defense prove it by a preponderance of evidence. Defendants have failed in that respect in this case. The only testimony on which to base the defense is that of the witness, McClelland, whom the lower court in written opinion states he did not believe. The fire was no different from thousands of other buildings that burn. From the testimony we fail to find a suspicious circumstance. We fully agree with the lower court's findings on this point, which read as follows:

"The main defense is that plaintiff either set fire to the building or procured someone else to set fire to it. The only testimony offered by defendant is that of J. H. (Sam) McClelland, who swears that in April, 1930, A. Brooks, the plaintiff herein, offered him $200.00 to set fire to the building. McClelland appears to be a man about town, with nothing in particular to do. The only occupations shown by the testimony seem to be: three days operating a restaurant in this building, playing cards and riding around at night with the night marshall.

"McClelland says that when plaintiff made him the proposition to burn the building he did not, at first, think he was serious, but that he continued until he realized he was serious, when he, McClelland, positively refused to have anything to do with such a project. This witness says that he immediately within an hour told Mack Boyle, the night marshall of this conversation. Mr. Boyle told the marshall, who in turn told the Sheriff. McClelland then told the Marshall himself about the proposition made to him by plaintiff. The various officers above mentioned testified as to McClelland informing them,

but none knew anything except what they had heard from McClelland.

"McClelland further testifies that on the evening before the fire between four and six o'clock, he started into this restaurant, which is located in the main business part of the town of Winnsboro. He partly opened the door, saw plaintiff up in the loft or attic with a bucket on the end of a rope, and a man he did not know on the floor. It seemed like they were raising something. up into the attic in this bucket. The witness says he thought he was not wanted and did not go on into the building. Later he says he did not go in because he did not see the party he was looking for. He says that he thought about what Brooks had said to him back in April, and suspected that they were hoisting gasoline or coal oil for the purpose of setting fire to the building.

"McClelland played cards that night till about twelve o'clock, after which he rode about town with the night marshall until the fire, which occurred about one-thirty or two o'clock.

"The fact that this witness told the night marshall about what Brooks had said to him, and the fact that this was long prior to the fire, makes it seem quite reasonable that Brooks did make the statement to him. If his testimony had stopped there, it would be given much more weight by this court. However, what he says about the attic and bucket reduces greatly the weight that would otherwise be given to his evidence.

"In April, when Brooks merely spoke to him about burning the building, he immediately went to the night marshall, yet on the evening of October 11, when he saw what he thought was actual preparation to burn, he did not go to the night marshall or any other officer, but on the contrary rode around about two hours before the fire with this same night marshall without saying anything to him about it. Then, too, he claims that on Saturday evening between four and six o'clock, in a restaurant in the heart of town, without the door being locked, plaintiff was raising gasoline or kerosene with a bucket up into the attic for the purpose of setting fire to the building. This is almost too incredible to consider for a moment.

"There is absolutely no other legal evidence pointing to arson. One T. W. Albritton says a man by the name of Fritz, warned him that there would be a fire in this building. What Fritz said, of course, is hearsay. It is not shown who Fritz was or what he said. It may be that he got his information from McClelland as to the fire. At any rate it is not such evidence as can be considered.

"The plaintiff denies this conversation with McClelland. He also says that when McClelland was operating the restaurant in his,

Brooks' Building, he suspected him of handling whisky and put him out. McClelland says he was only there three days and quit because there was no business. We hardly see how he could determine from three days' operation whether there was much business or not.

"The testimony is positive that plaintiff was at home one-half mile distant when the fire broke out. For this reason, he hardly set fire to it himself, but defendant claims that he procured someone to do so. It is argued that the fire was of incendiary origin and as plaintiff contemplated the burning of it, he evidently found someone to do so. The only argument as to it being of incendiary origin is the fact that it started on the inside of the building. It seems to us that most accidental fires start on the inside. If it were from a cross circuit of electric wires, from a rat gnawing a match, from a cigarette left slowly burning on the inside, or from a great many other accidental means, it would surely start from the inside.

"From the foregoing, we cannot say that the preponderance of the evidence is to the effect that plaintiff either fired the building or had it done. For this reason the defense of arson must fall."

On the next defense set up the lower court had the following to say:

"Defendant denies that the furniture and fixtures were of the value claimed by plaintiff. Shortly after the fire, plaintiff submitted an itemized list with values showing $2602.50, which was offered as P. 1. He says this is as near the values as he could get at it, and that they were replacement values. The policy (line 2 on back), approves of replacement values under certain conditions. Plaintiff says that both insurance agents were furnished with a list approximately the same as this before the policies were written, which showed values totalling something over $2-500.00. Both agents inspected the property before issuing policies. W. F. Prickett placed a value of $1200.00 on them, but would not say that they were not worth more than that sum. The evidence shows that these fixtures were in good condition. By adopting any reasonable method of depreciation they could hardly be placed at a less total value than $1200.00. Under the three-fourths valuation clause they could be insured for $900.00, if they were worth $1200.00. They were really only insured for $800.00, so that there can be no doubt but that they were worth that much.

"It is true that plaintiff only paid $305.00 for these fixtures. However, he bought them, secondhand, from Mrs. Metsker after her husband died, and we do not know the reason he got them so cheaply. He also bought the house and lot from her for $1500.00, and a money-lender loaned him $1700.00 on it, so that it appears quite plain that he got some

wonderful bargains from Mrs. Metsker. The fact that he only paid $305.00 will have to give way to the other evidence of true value as set forth above."

We find no error in the conclusion of the trial judgment on this defense.

Before the first four policies were written, defendant's agents had in their possession a list of the property then in the building, with the estimated value placed thereon by plaintiff. Both agents inspected the property and fixed the amount of insurance they would allow on the property at $1,200, for the building and $800 for the furniture and fixtures. The value of the building that was destroyed by fire is proved to have been far in excess of the amount of insurance on it. There is no merit to this defense, and plaintiff has clearly proved the value of the furniture and fixtures insured by the first four policies was in excess of $1,200, and that the building was of a value of $2,000.

■ The third defense that the first four policies are void because plaintiff secured additional insurance to a greater amount than permitted in the policies, in that he secured $450 insurance on certain furniture and fixtures from the Mercantile Insurance Company of America. The lower court disposed of this defense in the following language: "The testimony shows that a policy for $450.-00 was taken out on new fixtures (see p. 2) that were placed in the building after the first four policies were issued. Under the ruling in Parker v. State Assurance Company, 6 La. App. 163, this does not avoid the policies."

In May and June, 1930, after the first four policies were issued, plaintiff purchased an Ezy washer for $40, a Frigidaire machine and counter for $1,025, a Thor washer for the price of $290, paying part cash and the remainder in notes secured by chattel mortgage. He also secured some irons and other equipment necessary to operate a laundry. He applied to the agents who had written the insurance in the first four policies for additional insurance to cover this new furniture and fixtures, and was informed they did not care to write any more insurance. He then saw the agent of the Mercantile Insurance Company of America, and secured a policy for $450 on the new furniture and fixtures. This agent was informed of the other insurance on the other furniture and fixtures, and was told that plaintiff had only made a part payment on the Frigidaire and washer, and only wanted to insure whatever interest he had therein; that he at that time still owed for the machines. With this information, the insurance was issued by the agents of the Mercantile Insurance Company of America, and, after it was issued, plaintiff told Mr. Lowery, Sr., of the agency representing the other companies, that he had secured the $450 insurance on the

new furniture, and there was no objection made.

The reasoning in Parker v. State Assurance Company, supra, is applicable to the facts in this case, and the clause prohibiting additional insurance only applied to the furniture and fixtures covered by the first four policies and not to the new furniture purchased after the issuance of the original four policies.

The next defense is that the policies are void as to the furniture and fixtures because a chattel mortgage was placed on part of them. The lower court correctly disposed of this defense in the following language:

"A further defense is made that the policies are void as to the furniture and fixtures by reason of the fact that a chattel mortgage was placed on part of them. According to the evidence no chattel mortgage existed on any except the new machinery bought and placed in the building after the first four policies were issued. These first policies covered meat market and restaurant furniture and fixtures, whereas most of the added property had to do with washing machinery, so that the first policies clearly did not cover the additional machinery. Even if the new goods were not clearly of a different nature the chattel mortgage given for balance of purchase price on new furniture and fixtures would not avoid the policies issued before they were placed in the building (Parker v. State Assurance Co., supra). It therefore is clear that the first four policies were not avoided by the chattel mortgages on the new or added machinery.

"Even though it might be held that the Parker Case is not applicable, yet we doubt whether the chattel mortgage in this case should avoid any of the policies. Under the terms of Act 222 of 1928, the breach of the chattel mortgage clause would not be a defense unless it increased the moral or physical risk. According to Sigrest v. Federal Insurance Company, 14 La. App. 55, 129 So. 379, the burden is upon defendant to show an increased risk. No testimony was offered on this point. It is quite clear that the mere placing of a mortgage upon personal property does not increase the physical risk. It may be argued that a chattel mortgage necessarily increases the moral risk, and that no proof need be offered on this point. This may be true as to an ordinary chattel mortgage, but it seems rather doubtful in this case. The only such mortgages were vendor's lien and special chattel mortgages given to secure the payment of the balance of the purchase price on certain articles. An ordinary chattel mortgage might add to the moral risk by increasing the number of people that might be interested in having the property destroyed by fire in order to collect the amount of the mortgage debt, or by permitting the owner to mortgage it and then burn and collect insur-

ance. However, in this case, without the chattel mortgage, the seller held a vendor's lien to secure the balance of the purchase price. This lien is just as effective and binding under our laws, except that in case of mortgage the holder can follow the property into third hands, and can prosecute the mortgagor criminally under certain circumstances. We, therefore, fail to see where the defendant has supported the burden of proving that the physical or moral risk has been increased."

Defendant at last contends that the judgment is erroneous, in that it adjudged them to pay the statutory penalties and attorney's fees, and avers that the nature of their defense was a serious defense, and one they were entitled to make, and therefore they should not be mulcted for the penalties and attorney's fees. The Supreme Court of this state in a case reported in 175 La. 599, 143 So. 705, 707, entitled Isaac Bell, Inc., v. Security Insurance Co., said: "We think that section 3 of Act No. 168 of 1908 is mandatory and must be given effect in every case where the insurance company resists payment of the whole or any part of a loss covered by its policy, provided the insured judicially recovers more than the insurer admits to be due and timely tenders or pays to him."

Section 3 of Act No. 168 of 1908 provides that the insurer shall pay within sixty days after receiving the proof of loss, and, for failure to do so after demand, shall be liable for penalties of 12 per cent. damages on the total amount of the loss, as determined by the court, and reasonable attorney's fees. They likewise contend that no attorney's fees were proved, and therefore none can be allowed. This question was fully discussed in the case of Sigrest v. Federal Insurance Company, 14 La. App. 55, 129 So. 379, wherein numerous decisions of the Supreme Court are reviewed. The court has repeatedly held that it reserves to itself the right of making a conscientious estimate of the services performed and will fix the amount of attorney's fees, without reference to the opinion of witnesses. And in Hunt v. Hill, 138 La. 583, 70 So. 522, the court said that the testimony of lawyers was admissible and was entitled to its consideration in determining the case, but it did not accept their estimate of the services as binding on the court. The services in these cases were rendered under the eye of the court, and the taxation should be made on its own responsibility. Dorsey v. His Creditors, 5 Mart. (N. S.), 399.

The lower court fixed the compensation of the attorney for plaintiff at $100 in each case, which is practically 20 per cent. This is the usual fee in litigated matters, and we see no error in this respect.

It is therefore ordered, adjudged, and decreed that the judgment of the lower court be affirmed, with costs.