## FIRST NAT. BANK IN MANSFIELD et al. v. HARTFORD FIRE INS. CO.

### No. 5946.

Court of Appeal of Louisiana. Second Circuit.

Feb. 7, 1940.

Rehearing Denied March 6, 1940.

Writ of Certiorari and Review Denied April 29, 1940.

Coleman & Morgan, of Shreveport, for defendant, appellant.

Parsons & Hunter, of Mansfield, for plaintiff, appellee.

DREW, Judge.

The lower court has minutely set forth the issues in this case and discussed the evidence offered on trial thereof in the following lengthy opinion:

"The plaintiffs have instituted 'this suit against the defendant to recover judgment in the sum of $608, with legal interest therefrom from judicial demand until paid, together with 12% penalty thereon and $200 attorney's fees.

"Said suit being against the defendant to recover on a certain fire insurance policy which covered a Dodge four-door, sedan model, 1937 automobile, owned by T. H. and Ray Bedsole, who had purchased the same from the Bedsole Logging Company, the said Bedsoles having given $100 each, or $200 in cash, and executed their note secured by a chattel mortgage on the car. The Bedsole Logging Company sold the note, which provided for installment payments, to the First National Bank in Mansfield, Louisiana. The insurance was secured on the car by Ray Bedsole and the insurance agency for the insurance company delivered the policy to the First National Bank. The policy was issued on December 2, 1937, and the car was destroyed by fire on December 4, 1937.

"The defendant company filed an exception of no cause or no right of action and the same was argued and submitted and overruled by authority of the decisions of Investors' Mortgage Company v. Marine & Motor Insurance Company, 155 La. 627, 628, 99 So. 486, and McClelland et al. v. Greenwich Insurance Company, 107 La. 124, 31 So. 691.

"The defendant, Hartford Fire Insurance Company, then filed its answer and denied its liability on several grounds, as follows, to-wit:

"1. That the policy was voided from the date of its issuance because there was an outstanding first mortgage on said automobile. The mortgage on said automobile was undisclosed to your respondent and not permitted under said policy.

"2. That because of the misrepresentation as to the automobile being a demonstrator by the Bedsoles, both were violations of material warranty.

"3. That if said policy was not voided from the date of its issuance, all rights thereunder had been forfeited for the reasons; First, that the Bedsoles, the assureds under said policy, have failed to furnish respondent herein with proof of loss, all as is required by said policy; and second, by reason of the attempted fraud on the part of the said Bedsoles in setting fire to or causing to be set fire to the said automobile for the purpose of collecting insurance money from respondent.

"Upon the above issues, the case was tried, argued orally, and finally submitted on briefs.

"In order to give a history of the automobile which was burned, the parties, insurance of the car and the evidence of the case, it will be necessary for the court to cover the facts in part, as revealed by the evidence.

"The Bedsole Logging Company on April 24, 1937, sold the Dodge car to Mrs. J. C. Wise for the sum of $1,139. She paid the amount of $275 cash and executed a chattel mortgage on the car, giving her one promissory note, payable in monthly installments in the sum of $48.00, said installments being 18 in number. The Bedsole Logging Company sold the above vendor's note to the Commercial Credit Company, or some credit company, in Shreveport, Louisiana. On May 20, 1937, without the knowledge of the Bedsole Logging Company or the Credit Company which bought her note, Mrs. Wise executed a certain note and secured the same with a chattel mortgage to H. H. Samuels for a past-due debt or an account in the sum of $427, payments to be made on the note in installments of $15 per month. She later has paid some on the note to Samuels.

"About the 1st of September, Mrs. Wise gave up her route with the Shreveport Journal, after having driven the car about 22,000 miles. She had no use for the car and I presume was unable to pay the balance due on same. Mrs. Wise delivered the car back to the Bedsole Logging Company, or to the Credit Company; Bedsole Logging Company having sold the note

executed by her, with recourse took the car and redeemed the note secured by the aforesaid chattel mortgage from the Credit Company, which T. H. Bedsole stated to be in the amount of $842, or about that much balance due by Mrs. Wise.

"The evidence shows that the Bedsole Logging Company did not know nor did Ray Bedsole or T. H. Bedsole, Jr., know that Mrs. Wise had executed a mortgage to H. H. Samuels at the time the car was redeemed, nor did they know about a second mortgage until after the car was destroyed by fire.

"A short while after the car was redeemed by the Bedsole Logging Company, certain repairs were made on the car, the exact amount of which is not clear, however, it added to the value of the car.

"Ray Bedsole and T. H. Bedsole, Jr., gave to the Bedsole Logging Company the sum of $100 each in cash, or the sum of $200 together, for the car and executed their note and gave a chattel mortgage to the Bedsole Logging Company for the sum of $689, which was to cover the balance due on the car and take care of the carrying charges. T. H. Bedsole, Sr., the father of the said Ray Bedsole and T. H. Bedsole, Jr., on behalf of the Bedsole Logging Company, went to the First National Bank in Mansfield with the mortgage note, and also certain other checks to deposit in the bank. He sold the note secured by the mortgage executed by his two sons to the First National Bank. Mr. Evans Calvert, cashier of the bank, asked Mr. T. H. Bedsole, Sr., if the car was insured and was informed that it was not, stating that they used the car as a demonstrator. Mr. Calvert then bought the note and the proceeds were deposited in the bank to the credit of the Bedsole Logging Company, less the amount of a note of some amount under $200 which Ray Bedsole owed the bank. Calvert, the cashier, pushed through the window to T. H. Bedsole, Sr., the amount of the premium for the insurance on the car, and instructed Bedsole to see McFarland, Peyton & Guy to have the car insured.

"T. H. Bedsole, Sr., went home and told Ray Bedsole to go up and have insurance taken out on the car and to try to get new car rates. Ray Bedsole did not take the cash balance, but came to the office of the insurance company and requested new car rates. He also had the car there where Mr. Peyton could see it. Mr. Peyton did look out the window at the automobile, but did not examine it, and stated that it was represented to him that it was a demonstrator and that he had in mind what a demonstrator was. Ray's recollection was that he stated that it was a used car. It is my opinion that Mr. Peyton understood that it was a demonstrator car.

"For some reason, Ray Bedsole overpaid the premium on the insurance policy and Mr. Hall Peyton returned a part of the money paid him. The insurance company did not insure the car for its full value. They insured it for the sum of $680, or $9 less than the mortgage against it.

"Two days after the automobile was insured and the policy delivered to the bank, Ray Bedsole, according to his evidence, decided to go out in the country and see a negro by the name of Pegues about a small account. He told his brother where he was going; and this was about 4 P. M., or late in the afternoon of December 4, 1937. When he had left the paved road going south through Benson about three miles, he went about half a mile on the old graveled road and then turned off on a dirt road east, and, according to his evidence, he saw smoke issuing from the car when he was nearing a small branch. He got out and discovered the car was afire. He remained there for some time. It is not certain just how long, between one-half an hour to an hour or longer, or until the car was completely burned. According to his evidence, T. H. Bedsole, Jr., came up in another car and he got in the car with T. H. Jr., and returned to town. T. H. Bedsole, Jr., stated that he knew where his brother had gone and when he did not return in a short time or more than an hour or an hour and a half, he went to look for him, as that custom existed in the family when one was out and did not return on time, he was looked for.

"A short time after the car burned, the Bedsoles, or one of them, informed McFarland, Peyton & Guy about the car having been destroyed by fire. A few days thereafter, an insurance adjuster came to Mansfield to investigate the fire and he knew that the First National Bank held a mortgage against it, as well as interest in the insurance, or that the policy was at the bank. He called on Mr.

Calvert and saw the policy, the kind of policy, and he and Mr. Calvert talked about the policy and of the fire. Neither Mr. Calvert nor the bank had heard of the car having been destroyed by fire until Mr. Miller, the insurance adjuster, told him of it.

"Mr. Calvert said that he was assured that the bank would be paid the amount of the insurance and that it would be perhaps 60 days, or the time allowed the company, to pay under the policy. Mr. Miller contends that he never admitted any liability or assured Mr. Calvert the bank would be paid. Calvert says he did. We will discuss their evidence later.

"On March 24, 1938, Mr. Calvert wrote the insurance company about the payment of the insurance and was informed by Mr. H. M. Holland, special agent for the Hartford Fire Insurance Company, that the company denied liability. Later, Parsons & Hunter, attorneys, wrote the Insurance Company and the reply of the company by letter of their attorney continued to deny any liability. During this time a proof of loss blank was sent to Ray Bedsole and received by him. Later, he called at the insurance adjuster's office in Shreveport and obtained another blank. He thought that he filled one out, but the evidence shows that there was no proof of loss returned to the company. The plaintiff, First National Bank, never received a blank to make proof of loss nor did it ever fill one out.

"The suit was finally filed, as above stated.

"I have tried to cover the facts in a general way which have caused this suit and will touch upon certain parts of the evidence in passing upon it and the law which has a bearing upon the rights of the parties hereto.

"The policy issued by the defendant to Ray Bedsole and T. H. Bedsole, Jr., assured, and payable to assured and the First National Bank in Mansfield, in case of loss as their interest may appear, is a general policy taken out in the name of the assured, with a loss payable clause in favor of the bank. After considering the policy in the Officer case, Officer v. American Eagle Fire Ins. Co., 175 La. 581, 143 So. 500, I am of the opinion that the bank was not the assured, although at the same time all parties,—the Bedsoles, the bank and the Insurance Company, knew the insurance was being issued for the protection of the mortgage of the bank, yet the policy was not perhaps written to meet the intention of all parties.

"This is not a suit to reform the policy and the objections were timely made and sustained, insofar as the evidence may change or alter the policy sued upon. So, it is my conclusion the policy should be treated as above stated and construed by the Supreme Court in Dr. Officer v. American Eagle Fire Insurance Company, 175 La. 581, 143 So. 500.

"Ray Bedsole and T. H. Bedsole, Jr., being the assured and the bank having a mortgage on the car burned and the policy stating that, in case of loss, same would be paid to the assured and First National Bank, as their interest may appear, it was proper to join all of them together as plaintiffs.

" 'It is not improper practice to join with the assured, as plaintiff in an action on a policy of assurance against fire, the party who is named in the policy as beneficiary thereof to the extent that his interest may appear.' McClelland et al. v. Greenwich Ins. Company, 107 La. 124, 31 So. 691.

"The above is a sensible view of such a situation because it prevents a multitude of lawsuits and brings before the court all parties having interest in the subject of dispute.

" 'After the insurance company's adjuster had visited the scene of the fire, had taken the measurements of the burned building, had suggested the employment of an architect to make estimate of the cost of replacing the structure, had possessed himself of the books and invoices of the insured, had gone over them carefully, had acquired information of all necessary facts and figures and then had made the insured an offer of a given sum in settlement of the loss, which was declined, the company is not in a position, when sued, to urge in defense that it is not shown any written notice of the fire, nor preliminary proofs of loss, were delivered to it, as the terms of the policy require.' McClelland v. Greenwich Insurance Company, supra.

"It is true that the blanks furnished by the adjuster for proof of loss were not signed and furnished the defendant company. Why should the company make such complaint when it was sued. It knew all the facts, had been informed and its adjuster had made a complete investigation, had investigated every angle of the case. The adjuster had informed the First Na-

tional Bank of the loss. They had investigated the mortgage records and found that there existed another mortgage on the car given by Mrs. Wise to H. H. Samuels.

"The defendant had all the information it desired furnished it by its adjuster. It had declined liability in its letter to the bank. It rested its case solely upon the defense that the petitioners, Ray Bedsole and T. H. Bedsole, Jr., had been indicted for burning the car. This indictment was its only reason for there was no other unless after suit was filed.

"Mr. Calvert testified as follows:

"'Q. Mr. Calvert, you didn't see this automobile burn, did you? A. No.

"'Q. The first knowledge you had of the destruction of the automobile was several days thereafter? A. I don't know when it burned. The adjuster came in the Bank and told me about it.

"'Q. Did you ever see the automobile after it burned? A. I have never seen it before nor since. * * *

"'Q. Did he talk to you about having a policy, and so forth and so on? A. Yes.

"'Q. At that time what did he ask you? What did he tell you about the Bedsole Logging Company policy? A. I don't remember what he asked me except it seems that he asked me if we had a mortgage on it. We had a short conversation about it and something was said about a settlement, and he told me that we would get our money, but he was quite sure there would be some investigation and the company would wait the 60 days they were allowed.'

"Mr. Miller, a witness for the adjuster, testified as follows:

"'Q. Did you examine the policy covering this loss? A. I did.

"'Q. Where was the policy when you examined it? A. In the First National Bank.

"'Q. Who did you talk to in the Bank in regard to this matter? A. I talked to Mr. Calvert.

"'Q. Mr. Miller, did you agree to pay Mr. Calvert for this loss or advise him that the company would pay him? A. No.

"'Q. What did you advise Mr. Calvert in regard to the loss? A. I told Mr. Calvert I wanted to see the policy and the only information we get from the agent who reports the loss is the number of the policy and we didn't know the limit of liability nor what the coverage was. I saw it was a standard policy written in the name of Ray and T. H. Bedsole, Jr., with a loss payable clause to the Bank and I explained, in talking to Mr. Calvert, that any payments that would be made, he would be protected; that nobody could spend the money if he got the draft, as his name would be included in it.'

"I don't recall that I knew Mr. Miller before this trial and I could not say but what he was telling the facts as he remembered them; in fact, he seemed to be fair. I am well acquainted with Mr. Calvert and know that he would not ask this court to grant judgment in his favor if he did not think he was telling the truth. I feel sure that the recollections of the two witnesses differ to some extent in the case. It is a known fact that insurance adjusters and banks never overlook many things that are said in regard to a business transaction. Who in this case had a reason to be impressed with the conversation? Calvert certainly did. His bank had $680 at stake and he was anxious to be paid after he was informed about the fire. On March 24th, Calvert's mind was still clear, as is shown by the letter addressed to the Insurance Company. It was objected to as a self-serving document by the defendant. However, the letter clears up the conversation and also the reply to same by Mr. Holland shows the company denied liability. I am convinced after due consideration of the testimony of the two witnesses, that Calvert had a better recollection of what was said than Miller. The latter has many cases to investigate. Calvert had one and his bank's money was tied up and he could remember more clearly what was said there in the bank.

"The company, having denied liability, as shown in its letter in reply to Calvert and its letter by its attorney in reply to one from Parsons & Hunter, does not have to make proof of loss. Neither Ray Bedsole, T. H. Bedsole, Jr., nor the bank were required to make proof of loss. This was held in the case of McClelland v. Greenwich Insurance Company, cited above. The same was also held in the case of St. Landry Wholesale Mercantile Company v. Teutonia Insurance Company of New Orleans, 113 La. 1053, 37 So. 967.

"As to the second mortgage defense of the defendant, as stated above, it was given and there is no question it was without the knowledge of any of the Bedsoles, the bank or Insurance Company. Mrs. Wise gave

the mortgage to Mr. Samuels and, if it had been given with the knowledge of the Bedsole Logging Company, it could not prime the vendor's lien given by Mrs. Wise. The mortgage that was executed by her came first and it could have been foreclosed for the purchase price. The Bedsole Logging Company took the car back and paid the vendor's note or redeemed same, and his taking the car and paying the first note, in my opinion, gave the Bedsole Logging Company a clear title to the car.

"Moral hazard, which, if increased, avoids fire policy, relates to pecuniary interest which insured or another has, in protecting or destroying the property. If the second mortgage does not increase the hazard of the insurer, then it cannot avoid a policy. For authority on this question, the following are cited: Sections 4179 and 4191 of Dart's Statutes; Parker v. State Assur. Co., 6 La.App. 163; Brooks v. Liverpool & London & Globe Ins. Co., La. App., 144 So. 788; Sigrest v. Federal Ins. Co., 14 La.App. 55, 129 So. 379; and Knowles v. Dixie Fire Ins. Co., 177 La. 941, 149 So. 528.

"4th: Defense as to a misrepresentation of the value of the car. It was shown that when the car was redeemed, it cost $842 or $850 to repay the note. It was also shown that there was a certain amount of repair work done on the car. Mr. Enloe testified that the car was well worth $800 or $850. In fact, all of the evidence shows that the car was well worth at least $850 and I am of the opinion that it was worth the sum of $850. There is no evidence that it was not worth the amount which Ray and T. H. Bedsole, Jr., paid for same. As to whether the statement that it was a demonstrator or a new or used car, it appears that it may have made some difference if it had been known to Mr. Peyton or to Mr. Calvert that the car was a used car, instead of a demonstrator. It is common knowledge that a demonstrator is a car that was once new; however, it is also shown, even though there was no difference on this point, that if a demonstrator had been used for some time, it may not be as good a car as a second-hand one. A demonstrator is put to all kinds of tests by the salesmen. Every prospect for a car is requested to drive it and often it is very much cheaper than a new car. The Insurance Company had a chance to view the car. It was driven up where Mr. Peyton could see it and the Insurance Company did not insure it

for what it was worth. The car was worth in value more than $800, and the defendant accepted the premium and insured the car for only $680, or near the range of the chattel mortgage, and there was not such a misrepresentation that would void the contract, nor such as would induce the assured to set fire to the car to collect the insurance when the car was worth more than it was insured for, and the two Bedsoles would not have any equity in the insurance in case of an early fire. See Alexander v. Home Ins. Co., La.App., 142 So. 708.

"5th: The defense of arson rests upon the defendant company to prove the same. See 144 So. 788, supra.

"The fire insurance company was of the opinion that Ray Bedsole burned the car when he drove it out into the country. We must accept what Ray and T. H. Bedsole, Jr., say about the burning of the car, as there was no one else there. We must accept the fact that they each paid $100 down on the car, as there has been no evidence to impeach the evidence given by them nor that of the father. It may be that the burning of the car did arouse suspicion in the minds of some, and especially the defendant. If you are going to accept a part of their testimony, you must accept all, unless it appears to be very unreasonable.

"T. H. Bedsole, Jr., stated that his brother, Ray, told him he was going to collect some money, or to see a negro, named Pegues, about an account, in the late afternoon, and that when his brother did not return, he went to see about him. That was his only reason for going and that this was the way they did. When one went somewhere and did not return on time, the other went to look for him. This may seem a suspicious statement to some; however, such often happens when one of the family goes fishing or hunting, or even on business and does not return on time, there exists anxiety to the extent that someone will go to see after the 'lost sheep'. I am unable to see anything strange in T. H. Bedsole's going to look for his brother, Ray. They are engaged in the logging business and dealing with people, no doubt, try to keep up with each other when engaged in business. The time that T. H. Bedsole, Jr., waited (an hour or more) before going to look for his brother is not an unreasonable time, as he should have returned before that time. We see Ray placed some time between the time he left home and the time his brother came after him. Both of

them say there was no understanding about the matter.

"Why Ray waited until the car burned up instead of leaving when it caught fire, I do not know. I do not know why he did not put out the fire, or attempt to extinguish it. All of this does not prove that he set it afire. If Ray and T. H. Bedsole, Jr., agreed to set fire to the car and lose their money and burn it just two days after it was insured, they should be tried for being insane, instead of being tried for arson. They could have burned the car, but to me the amount the car was insured for, the fact that it burned two days later, statements given by Ray and T. H. Bedsole, Jr., would not convince me they burned the car, even though it appears strange the car was burned two days later.

"For the sake of argument, we may say they did burn the car. I have to try the case on the evidence. The evidence does not convince me nor do I have an opinion that they burned it, in order to collect the insurance. I am convinced, after looking at the case from every angle, they did not burn the car. I do not know evidence was produced in order to indict them on a charge of arson nor am I passing on that case; but I do know that in this case the defendant has completely failed to establish the fact that Ray burned the car or to justify them in not paying the insurance.

"Ray and T. H. Bedsole, Jr., have lost their interest under the policy. They were the owners of the remaining interest in the car, or as their interest may appear. However, we find that the insurance policy does not take care of the note due the First National Bank and that under the mortgage and insurance, they have agreed that the holder of the note shall be paid. They have so stated on the trial of this case.

"It appears that in order to collect the penalty for failure to pay within 60 days, under Dart's Statutes, Sections 4179 and 4189, Act No. 168 of 1908, § 3, and Act No. 136 of 1922 § 1, the amount must be due and judgment given in favor of the assured. I am of the opinion that the Bank under this policy, with loss payable clause, is not entitled under the law to collect the penalty and attorney's fees.

"Therefore, I am of the opinion that the demands of Ray Bedsole and T. H. Bedsole, Jr., against Hartford Fire Insurance Company should be rejected, as the First National Bank is entitled to collect all of the insurance.

"It is the decision of this court that the First National Bank in Mansfield, Mansfield, Louisiana, have and recover judgment in its favor and against the Hartford Fire Insurance Company for the full sum of the policy, or $680, with legal interest thereon from judicial demand until paid. That the Hartford Fire Insurance Company shall pay all costs of this suit.

"For the above and foregoing reasons and the law and evidence being in favor thereof,—

"It is ordered, adjudged and decreed that the Hartford Fire Insurance Company do have and recover judgment against Ray and T. H. Bedsole, Jr., rejecting their demands for lack of interest in that certain insurance policy issued to them and payable to them and the First National Bank in Mansfield, as their interest may appear in case of loss on a certain Dodge automobile, as above set forth. Said policy is dated December 2, 1937. Their said interest having been subjected to the claim of the First National Bank in Mansfield.

"For the above and foregoing reason and the law and the evidence being in favor thereof,—

"It is ordered, adjudged and decreed that the First National Bank in Mansfield, Mansfield, Louisiana, do have and recover judgment in its favor and against the Hartford Fire Insurance Company for the full and just sum of $680, with legal interest thereon from judicial demand until paid, together with all costs of this suit. Said judgment being the interest that the said First National Bank in Mansfield has in and to, as mortgagee, under a certain chattel mortgage held by said bank, and the insurance policy sued on in this suit, and as shown by the evidence in this case, said policy dated December 2, 1937, and payable to Ray and T. H. Bedsole, Jr., assured, and to the First National Bank in Mansfield, as their interest may appear; said policy being No. 30,279.

"Thus done, read and signed in Chambers by consent of all parties at Mansfield, Louisiana, on this 3rd day of January, A. D., 1939.

"Hal A. Burgess,
"Judge of said Court."

From this judgment both plaintiff and defendant have appealed. Plaintiff contends here that it should have been awarded penalties and attorney's fees, as prayed for, and defendant contends that there should

not have been judgment in any amount against it.

The defense of arson is not urged here. It was correctly disposed of below. Defendant's only contention here is that the failure of the insured to make proof of loss, a's required by the policy, prevents recovery. The lower court has correctly determined this issue and its conclusions are supported by the authorities cited in its opinion. We are also convinced that the question of penalties and attorney's fees was likewise correctly determined by the lower court, due to the peculiar facts of this case as found by it and in which we agree.

The judgment is correct, and is affirmed.