781 So.2d 46 (2000)
Katherine SHORT
v.
PLANTATION MANAGEMENT CORPORATION d/b/a Golden Age Nursing Home.
No. 99 CA 0899.
Court of Appeal of Louisiana, First Circuit.
December 27, 2000.
*49 Thomas R. Juneau, Lafayette, Counsel for Defendant/Appellant, Plantation Management Corporation d/b/a Golden Age Nursing Home.
Timothy E. Pujol, Gonzales, James C. Percy, Baton Rouge, Jay J. Harris, Denham Springs, Counsel for Plaintiff/Appellee, Barbara Bullock.
Before: GONZALES, FITZSIMMONS, KUHN, GUIDRY, and WEIMER, JJ.
FITZSIMMONS, J.
Plantation Management Corporation d/b/a Golden Age Nursing Home (Plantation *50 Management) challenges a judgment finding it liable for damages sustained by a nursing home resident.

FACTUAL AND PROCEDURAL BACKGROUND
On June 15, 1995, Mrs. Katherine Short, 69 years of age, was admitted to Golden Age Nursing Home (Golden Age) in Denham Springs, Louisiana, after having undergone hip replacement surgery. When admitted to Golden Age, Mrs. Short also had a history of rheumatoid arthritis, anemia, cataracts, peptic ulcer disease, and osteoporosis. While at Golden Age, Mrs. Short frequently complained of pain all over her body and suffered from depression.
On October 29, 1995, nursing staff at Golden Age noted Mrs. Short's lower right leg was swollen and shiny. Mrs. Short's leg problem continued to worsen over the next two weeks. Nurses' notes indicate her feet were dark in color, her great right toe became "purplish," and Mrs. Short complained of much pain. On November 12, 1995, Mrs. Short's daughter, Barbara Bullock, and her granddaughter, Vickie Burton, visited Mrs. Short. After hearing Mrs. Short's complaints of pain, and seeing the extent of discoloration of her right foot, Ms. Bullock requested that an ambulance be called to take Mrs. Short to the hospital.
Mrs. Short was taken to the Medical Center of Baton Rouge where it was determined she had acute, chronic ischemia[1] of the right foot and an arterial occlusion (blockage) of all three tibial vessels above her right ankle. On November 13, 1995, Mrs. Short underwent a right popliteal to posterior tibialis artery bypass surgery to try to save her right foot. This procedure was unsuccessful, and on November 14, 1995, Mrs. Short's right leg was amputated below the knee. Mrs. Short was readmitted to the Medical Center of Baton Rouge on November 23, 1995, with complaints of chest pain. It was determined she had suffered a recent heart attack. Mrs. Short remained bedridden for the remainder of her life. She died on March 3, 1997.
On May 7, 1996, before her death, Mrs. Short filed suit against Plantation Management, seeking damages for the negligence and/or strict liability of Golden Age employees, who she alleged failed to properly provide her with adequate care, failed to properly investigate her complaints, and failed to timely seek medical advice regarding her complaints. She also alleged Plantation Management was negligent for failing to provide her with adequate care, failing to hire properly trained employees, and failing to provide proper training and adequate supervision for its employees.
After Mrs. Short's death, Ms. Bullock, in her capacity as administratrix of her mother's estate, filed a motion to be substituted as the proper party plaintiff in the suit. The order substituting Ms. Bullock as such was signed on June 10, 1997. On August 15, 1997, Ms. Bullock filed an amended petition, alleging that since Mrs. Short's death, it had been learned that Plantation Management's actions constituted violations of La. R.S. 40:2010.8, legislation enacted to protect the rights of nursing home residents (Residents' Bill of Rights Law).
On October 6, 1998, a bench trial was held, and on December 4, 1998, the trial court signed a judgment, in favor of Ms. Bullock, in her capacity as the administratrix of Mrs. Short's estate, and against Plantation Management, for $955,256.49, *51 plus legal interest and costs. The judgment consisted of $650,000.00 in general damages, $66,442.55 in medical expenses, and $238,813.94 in attorney fees.
Plantation Management appeals from this adverse judgment, contending: (1) the plaintiff failed to prove Mrs. Short's injuries were caused by Golden Age's negligence; (2) the trial court abused its discretion in awarding attorney fees of $238,813.94; (3) the trial court abused its discretion in awarding general damages of $650,000.00; and (4) the trial court erred in awarding interest on attorney fees since such interest was not specifically requested by the plaintiff. Additionally, on appeal, Plantation Management has filed peremptory exceptions of no right of action and no cause of action.

EXCEPTIONS

Improper Party Plaintiff
Plantation Management filed an exception of no right of action in this court, challenging Ms. Bullock's substitution as the proper party plaintiff in Mrs. Short's suit. Plantation Management also filed an exception of no cause of action, challenging Ms. Bullock's amendment of the petition to assert a cause of action under the Residents' Bill of Rights Law. The arguments raised in support of both exceptions address whether Ms. Bullock has a right of action in the present suit; therefore, because we have the power to note the absence of a right of a party on our own motion, we will address Plantation Management's exception of no cause of action as though it were filed as an exception of no right of action. La. C.C.P. art. 927; see Thompson v. Harrington, 99-571 (La.App. 3 Cir. 10/13/99), 746 So.2d 652, 656.
The objection of no right of action tests whether the plaintiff has a "real and actual interest" in the suit. Layne v. City of Mandeville, 98-2271 (La.App. 1 Cir. 11/5/99), 743 So.2d 1263, 1267, writ denied, XXXX-XXXX (La.2/18/00), 754 So.2d 966. Stated another way, an exception of no right of action determines whether the plaintiff belongs to the particular class to which the law grants a remedy for the particular harm alleged. Sivils v. Mitchell, 96-2528 (La.App. 1 Cir. 11/7/97), 704 So.2d 25, 27. The exception is appropriate when the plaintiff does not have an interest in the subject matter of the suit or legal capacity to proceed with a suit in a particular case. Layne, 743 So.2d at 1267.
Plantation Management first argues Ms. Bullock's substitution as the administratrix of Mrs. Short's succession was improper because Mrs. Short was survived by children who are in a category of legal successors, who take precedence over succession representatives when substitution of parties occurs.
According to La. C.C.P. art. 801, when a party dies during the pendency of an action which is not extinguished by his death, his legal successor may have himself substituted for the deceased party. As used in La. C.C.P. art. 801, "legal successor" means: "(1) [t]he survivors designated in [La. C.C. art.] 2315.1, if the action survives in their favor; and (2) [o]therwise, it means the succession representative of the deceased appointed by a court of this state, if the succession is under administration therein, or the heirs and legatees of the deceased, if the deceased's succession is not under administration therein." The survivors designated in La. C.C. art. 2315.1 as those qualified to recover damages for injury to a deceased person are: (1) the surviving spouse and/or children of the deceased; (2) the surviving father and/or mother of the deceased, if he left no surviving spouse or children; (3) the surviving brothers and sisters of the deceased, or any of them, if the deceased left *52 no surviving spouse, child, or parent; (4) the surviving grandfathers or grandmothers of the deceased, or any of them, if the deceased left no surviving spouse, children, parent, or sibling; (5) the deceased's succession representative, in the absence of any class of beneficiary set forth in the first four listed categories.
In this case, it is undisputed that Ms. Bullock is Mrs. Short's daughter. Thus, it is clear she is Mrs. Short's legal successor, in addition to being the administratrix of her mother's estate. Cf. Carl v. Naquin, 93-1725 (La.App. 1 Cir. 5/20/94), 637 So.2d 736 (succession administrator, who was not a La. C.C. art. 2315.1 legal successor, dismissed as party plaintiff because deceased was survived by a brother, who was a La. C.C. art. 2315.1 legal successor, and who is given higher preference as party plaintiff). We decline to vacate the judgment in this case solely because Ms. Bullock was substituted in the case as the administratrix of Mrs. Short's estate, rather than as Mrs. Short's legal successor. Clearly, Ms. Bullock, as Mrs. Short's daughter, is a legal successor who is entitled to pursue her mother's negligence/strict liability action against Plantation Management.

Heritability of Residents' Bill of Rights Law
The petition filed by Mrs. Short, before her death, asserted negligence and strict liability claims against Plantation Management. The claim under the Residents' Bill of Rights Law was first asserted by Ms. Bullock when she filed the amended petition after her mother's death. Therefore, a pivotal issue to be decided is whether the cause of action provided in La. R.S. 40:2010.9 is a heritable obligation. Additionally, can it be asserted by a legal successor of Mrs. Short, or is it a strictly personal obligation which ceased to exist when Mrs. Short died?
Louisiana Revised Statute 40:2010.6 et seq., was enacted in 1985. The law is based on the legislature's finding that persons residing in nursing homes are isolated from the community and often lack the means to assert their rights as individual citizens. La. R.S. 40:2010.6. The legislation requires all nursing homes to adopt and make a public statement of the rights and responsibilities of their residents and to treat the residents in accordance with the provisions of the statement. La. R.S. 40:2010.8(A). The statement must assure each resident of several rights, for example: the right to civil and religious liberties; the right to private and uncensored communications; the right to flexible visiting hours; the right to present grievances on behalf of himself or others; the right to manage his own financial affairs; the right to be fully informed of services not covered by the Social Security Act or the nursing home policy; the right to be adequately informed of his medical condition and proposed treatment and to participate in the planning of his medical treatment; the right to receive adequate and appropriate health care; the right to privacy in treatment and in caring for personal needs; the right to be treated courteously, fairly, and with the fullest measure of dignity; the right to be free from mental and physical abuse and from physical and chemical restraints; the right to be transferred or discharged only if necessary for his welfare and if his needs cannot be met by the facility; the right to select a personal physician; the right to retain and use personal clothing and possessions as space permits; the right to copies of nursing home rules and regulations; the right to receive a prompt response to all reasonable requests and inquiries; the right to use tobacco and to consume reasonable amounts of alcohol at his own expense; the right to retire and rise in accordance with his reasonable requests; and, the *53 right to have any significant change in his health status immediately reported to him and his legal representative or interested family member. La. R.S. 40:2010.8(A).
Any resident whose rights, as specified in La. R.S. 40:2010.8, are deprived or infringed upon shall have a cause of action against any nursing home responsible for the violation. The action may be brought by the resident, or his curator, including a curator ad hoc. La. R.S. 40:2010.9(A). In addition to the recovery of actual damages, any plaintiff who prevails in such an action shall generally be entitled to recover reasonable attorney fees and costs of the action. La. R.S. 40:2010.9(A).
Although there has been scant judicial attention focused on this particular topic, the Louisiana Second Circuit Court of Appeal has addressed the issue. In Gibson v. Monroe Manor Nursing Home, 32,806 (La.App. 2 Cir. 3/3/00), 756 So.2d 583, the court deemed the cause of action provided by La. R.S. 40:2010.9 to be a heritable obligation, which could be brought by a successor of the resident. The second circuit opined that the underpinnings of a nursing home's obligation not to violate the Residents' Bill of Rights Law are not an obligation intended for the exclusive benefit of any one obligee, but rather, constitute an obligation owed to each and all such residents to further the legislative goals of preserving the dignity and personal integrity of the residents and safeguarding against encroachments upon the residents' right to self-determination. Gibson, 756 So.2d at 586.[2]
Due to the lack of statutory expression that would provide for the heritability of the Residents' Bill of Rights Law, we look to the provisions of the civil code for guidance. An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor. Furthermore, every obligation is deemed heritable as to all parties, except when the contrary results from the terms or from the nature of the contract. La. C.C. art. 1765. Thus, the presumption is that an obligation is heritable, unless it is strictly personal.
An obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor due to "special skill or qualification of the obligor[.]" La. C.C. art. 1766. Additionally, when the performance is intended for the benefit of the obligee exclusively, the obligation is strictly personal on the part of the obligee. Id. The Comments to La. C.C. art. 1766 explain that a particular skill, social status or professional standing are features that render an obligation strictly personal. Examples of these exceptions to the general rule of transferability of an obligation or right include: fulfillment of a marriage engagement and the attendant obligation to respond in damages for nonperformance, Johnson v. Levy, 118 La. 447, 43 So. 46 (1907); the obligation of a musician under a contract to record music, Fletcher v. Rachou, 323 So.2d 163 (La.App. 3rd Cir.1975); and a contract for dancing lessons, Richardson v. Cole, 173 So.2d 336 (La.App. 2nd Cir.1965).
*54 Applying the distinctive characterizations of obligations to the facts at hand, the duty to provide nursing home services represents a strictly personal obligation that was extinguished at the time of Mrs. Short's death. The strictly personal obligation to provide nursing home services to Mrs. Short is, however, differentiated from the instant causes of action involving breaches of nursing home obligations that resulted in damages to Mrs. Short pursuant to La. R.S. 40:2010.6 et seq. In this regard, violations of the provisions of the Residents' Bill of Rights Law, relating to medical treatment, constitute an "offense or quasi-offense." As such they give rise to the application of La. C.C. art 2315.1, and the right of a survival action.
We thus conclude that the causes of action advanced pursuant to the Residents' Bill of Rights Law constitute heritable actions that can be asserted by a party's successor. Ms. Bullock belongs to the class of persons to which the law grants a remedy for the particular harm alleged. Accordingly, the exceptions of no right of action and no cause of action are denied.

CAUSATION
In assignment of error number two, Plantation Management argues that Ms. Bullock failed to prove that the amputation of Mrs. Short's right leg and her subsequent heart attack were caused by the negligence of Golden Age.
In an action to recover damages for injuries allegedly caused by another's negligence, the plaintiff has the burden of proving the defendant's negligence by a preponderance of the evidence. Cangelosi v. Our Lady of the Lake Regional Medical Center, 564 So.2d 654, 664 (La. 1989). Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact or causation sought to be proved is more probable than not. Boudreaux v. American Insurance Company, 262 La. 721, 264 So.2d 621, 626 (1972). To carry his burden of proof, the plaintiff must produce evidence from which the factfinder can reasonably conclude that his injuries, more probably than not, were caused by the negligence of the particular defendant. The plaintiff, however, does not have to conclusively exclude all other possible explanations for his injuries, because the standard is not proof beyond a reasonable doubt. Cangelosi, 564 So.2d at 664.
In this case, the trial court determined the staff of Golden Age was negligent for failing to present Mrs. Short for evaluation by a doctor before November 12, 1995. With regard to whether this negligence caused Mrs. Short's subsequent injuries, the trial court stated:
Based on the most credible evidence[,] this court finds[] the symptoms exhibited by Mrs. Short on October 29, 1995, were caused by an arterial occlusion and should have been reported to a medical doctor immediately. During the fourteen day delay before Mrs. Short was presented to a physician, the occlusion became progressively worse and gangrene set in prior to November 12, 1995. The failure of the first surgery, the "fem pop[,]" was attributable to the dead tissue, which was more probably than not caused by the gangrene. The amputation was necessary because of the failure of the first corrective surgery. The stress of the two surgeries caused Mrs. Short to suffer her heart attack. Mrs. Short was making progress toward becoming fully ambulatory after her hip surgery and the sole reason for her drastic decline was the failure to present her timely to a physician at the onset of her arterial occlusion. Golden Age was negligent and their fault was the sole *55 cause for the damages suffered by Mrs. Short.
A trial court's finding regarding causation is a factual determination which is reviewed under the manifest error standard of review. Shows v. Shoney's, Inc., 98-1254 (La.App. 1 Cir. 7/29/99), 738 So.2d 724, 732. As an appellate court, we cannot set aside the trial court's factual findings unless we determine there is no reasonable factual basis for the findings and the findings are clearly wrong. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Thus, if the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989).

Amputation of Leg
We first consider whether the plaintiff proved by a preponderance of the evidence that Golden Age's negligence caused the amputation of Mrs. Short's right leg. After a thorough review of the evidence on this issue, we conclude there is a reasonable basis for the trial court's determination on this issue.
Dr. Durwin D. Walker, Golden Age's medical director, who is certified in general practice and geriatrics, was on call on November 12, 1995, when Mrs. Short was admitted to the emergency room. At that time, Dr. Walker examined Mrs. Short and confirmed she had an arterial occlusion in her lower right extremity. In his deposition, Dr. Walker reviewed the Golden Age nurses' notes which documented Mrs. Short's symptoms from October 29, 1995, through November 12, 1995. According to Dr. Walker, the failure to consult a doctor regarding Mrs. Short's symptoms, given the findings that began as early as October 29, 1995, resulted in a delay in her treatment. However, when asked whether earlier reporting of Mrs. Short's symptoms could have prevented the amputation of her leg, Dr. Walker was unable to testify that it was probable Mrs. Short's leg could have been saved. He stated, "I think that the failure to report those things led to a delay in her treatment. I can't really say that it led to an amputation that would not have otherwise occurred, but it's certainly true that the longer an ischemic limb goes untreated, the less likely it is to be salvageable." He noted it was "a whole lot more likely" that Mrs. Short's leg could have been saved had her symptoms been reported five days earlier, but admitted that "it may not have been salvageable even then[.]" Dr. Walker was unable to determine when the complete occlusion occurred in Mrs. Short's leg. However, he did state that, if the occlusion occurred on November 12, the day before Mrs. Short's first surgery, it could have damaged tissue in her leg, but probably would not have led to gangrene, which was evident when the second surgery was performed. Dr. Walker opined that the bypass surgery failed because the tissue in Mrs. Short's leg "was already too damaged from lack of blood flow for that period of time that she had had symptoms for the operation to revitalize the tissue."
Dr. Andrew Olinde, the vascular surgeon who performed the right popliteal tibial bypass surgery and the amputation of Mrs. Short's right lower leg, also testified by deposition. According to Dr. Olinde, a doctor should have been consulted by the Golden Age nursing staff regarding Mrs. Short's symptoms at least by November 9, 1995, when it was noted that her feet were dark in color. According to Dr. Olinde, if Mrs. Short would have been brought to the hospital on November 9, *56 the success of the bypass surgery "might" have been 50 percent, but the delay until November 12 decreased the success rate of the surgery to "maybe" 30 percent. Dr. Olinde opined that the bypass surgery failed because the "collection" or "outflow" bed of blood vessels to which the bypass was connected was inadequate to support blood flow to Mrs. Short's foot. An arteriogram conducted prior to the surgery indicated Mrs. Short had a blockage in the calf area and that the blood vessels in her right ankle and foot were "not great." When specifically asked whether the collection bed would have been any better had he operated on Mrs. Short three days earlier than November 12, Dr. Olinde could not say that it would have been; however, he indicated her outflow problem did worsen because of the three or four day delay. Dr. Olinde agreed with Dr. Walker's opinion that gangrene probably would not have resulted if the occlusion had only occurred the day before Mrs. Short's first surgery. According to Dr. Olinde, Mrs. Short's blockage was "pretty advanced" when she arrived at the hospital on November 12, 1995, and looked as though it "had been there for a while" and had not just happened.
An overall review of the above medical evidence demonstrates the trial court had a reasonable basis upon which to determine that the failure of the bypass surgery and necessity of the amputation surgery were caused by Golden Age's failure to timely report Mrs. Short's medical condition to a doctor. The existence of gangrene indicated to the trial court that the occlusion in Mrs. Short's lower right leg existed for several days prior to her presentation at the hospital on November 12, 1995. The trial court reasoned the bypass surgery failed because of dead tissue through which blood could not flow. These determinations are supported by the testimony of Dr. Walker, as well as Dr. Olinde. Although neither specifically indicated exactly when the occlusion occurred, their testimony demonstrates the occlusion probably existed for several days prior to Mrs. Short's presentation to the hospital. The trial court's factual findings on this issue are reasonable in light of the evidence in the record and are not clearly wrong. This assignment of error is without merit.

Heart Attack
We next address the existence vel non of a reasonable basis for the trial court's determination that Golden Age's (and thereby Plantation Management's) negligence caused Mrs. Short's heart attack. According to the medical evidence, Mrs. Short was admitted to the hospital eight days after the amputation surgery on November 23, 1995, with complaints of chest pain. An electrocardiogram was performed, which revealed Mrs. Short had suffered a recent heart attack. At his deposition, Dr. Walker was questioned regarding Mrs. Short's heart attack. He explained that a heart attack was not "an extremely unusual complication" following surgery. Although he declined to state that Mrs. Short's amputation surgery "caused" her heart attack, Dr. Walker testified that the stress of the surgery "clearly could put her at an increased risk for having an acute event like a heart attack, and I believe that is what happened."
Dr. Andrew P. Rees was the cardiologist who diagnosed Mrs. Short's heart attack following the amputation surgery, and the physician who treated her heart condition. He was unable to determine exactly when the heart attack occurred, but he testified that his best evaluation was that the heart attack might have occurred at or around the time of Mrs. Short's leg amputation surgery. He stated that either bypass *57 surgery or amputation surgery can induce enough stress to cause a heart attack.
Dr. Rees associated Mrs. Short's heart attack with the amputation as follows: "It would be my best estimation that given the presence of Ms. Short's cardiopulmonary decompensation, meaning signs of congestive heart failure, and the timing of what I felt to be pericarditis,[3] which was following her myocardial infarction,[4] in my opinion, I would estimate that her myocardial infarction may have occurred at or around the time of her surgery.... In effect, this surgery proved a stress test that Ms. Short failed in the worst of circumstances.... I felt that the clinical information would most likely indicate a recent myocardial infarction, which is well documented to be a cause of pericarditis."
When asked if he thought that "it is likely that this heart attack occurred during or after the amputation surgery," Dr. Rees responded: "That single fact would, alone, but, particularly, when viewed in light of the other conditions such as the timing of the onset of the pericarditis would incriminate that time period." Finally, Dr. Rees agreed that the surgery was a contributing cause to her heart attack "in this particular instance in [his] medical opinion."
The aforenoted evidence does not support the existence of manifest error on the part of the trial court's determination of causation. Accordingly, this assignment is without merit.

GENERAL DAMAGES
In assignment of error number four, Plantation Management contends the trial court abused its discretion in awarding general damages of $650,000.00. The trier of fact has much discretion in the assessment of damages. La. C.C. art. 2324.1. A reviewing court should not set aside an award of general damages, unless an analysis of the facts and circumstances reveals an abuse of the factfinder's discretion in setting the award. Smith v. Goetzman, 97-0968 (La.App. 1 Cir. 9/25/98), 720 So.2d 39, 47. The discretion vested in the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury, to the particular plaintiff, under the particular circumstances, that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). However, when the factfinder abuses its discretion by rendering an excessive or inadequate quantum decision, the appellate court merely raises the factfinder's inadequate award to the lowest reasonable amount or reduces the factfinder's excessive award to the highest reasonable amount. Andrus v. State Farm Mutual Automobile Insurance Company, 95-0801 (La.3/22/96), 670 So.2d 1206, 1211.
It is evident that Mrs. Short suffered considerable pain as a result of Golden Age's failure to timely present her to a doctor for medical attention. Ms. Bullock, Mrs. Short's daughter, testified that, when she arrived at Golden Age on November 12, 1995, for a visit, her mother was crying because of pain in her right foot. Upon examining Mrs. Short when she was admitted *58 to the hospital on November 12, 1995, Dr. Walker and Dr. Olinde both noted that she appeared to be in much "distress" and was complaining of pain in her right foot. Dr. Olinde testified that extremely poor circulation to a foot is a very painful condition. Mrs. Short then endured the bypass surgery on November 13, 1995, followed by more pain when the bypass surgery proved to be unsuccessful, and finally, the lower right leg amputation surgery on November 14, 1995. According to Ms. Bullock, following the amputation surgery, Mrs. Short was very depressed, experienced much phantom pain, would not eat, and "steadily went down." After her amputation surgery, Mrs. Short remained bedridden until her death in March of 1997.
We note Mrs. Short was not a well person before problems with her right leg began. Upon her admission to Golden Age, Mrs. Short was 69 years old and had recently undergone hip replacement surgery. When admitted, Mrs. Short also suffered from numerous ailments unrelated to her vascular problems, including rheumatoid arthritis, anemia, cataracts, peptic ulcer disease, and osteoporosis. Mrs. Short also suffered from confusion, depression, and sleep problems while at Golden Age. Golden Age contests Ms. Bullock's contention that Mrs. Short was not one to complain and was well on her way to becoming ambulatory again when her leg problem began.
Notwithstanding Mrs. Short's preexisting health, Golden Age's violation of several sections of the Residents' Bill of Rights and its precipitation of Mrs. Short's ultimate demise, including a heart attack, bypass and leg amputation surgeries, all of which involved considerable pain, augur for a substantial award in general damages. After reviewing the evidence, we do not find the award of $650,000.00 in general damages to be an abuse of the court's discretion.

INTEREST
Finally, we address the assignment of error contesting the court's award of interest on the award of attorney fees. Louisiana Code of Civil Procedure article 1921 provides: "The court shall award interest in the judgment as prayed for or as provided by law." Legal interest on attorney fees cannot be awarded unless the party seeking its recovery has specifically requested it. Southern Siding Company, Inc. v. Raymond, 96-2168, p.9 (La.App. 1 Cir. 9/19/97), 703 So.2d 44, 49, writ denied, 97-3206 (La.2/20/98), 709 So.2d 782. Ms. Bullock's petition sought legal interest on the judgment and reasonable attorney fees. However, due to the fact that legal interest on attorney fees was not expressly included in the prayer, the trial court's award of interest was erroneous. It is reversed.

DECREE
For the foregoing reasons, the judgment is affirmed, except as to the interest on attorney fees which is reversed. Costs of the appeal are assessed to Plantation Management Corporation d/b/a Golden Age Nursing Home.
AFFIRMED IN PART; REVERSED IN PART.
GONZALES, J., concurs in part, dissents in part and assigns reasons as to the opinion penned by FITZSIMMONS, J.; dissents and assigns reasons as to the opinion penned by WEIMER, J.
WEIMER, J., concurs with opinion written by FITZSIMMONS, J., and assigns additional reasons; he writes for a separate majority as to attorney fees.
KUHN, J., agrees with both majority opinions.
*59 GUIDRY, J., agrees with the two majority opinions.
FITZSIMMONS, J., dissents from the majority opinion penned by WEIMER, J., and assigns reasons.
WEIMER, J., concurs and assigns additional reasons.
I agree that the cause of action pursuant to the Residents' Bill of Rights Law (LSA-R.S. 40:2010.8) is heritable. See Gibson v. Monroe Manor Nursing Home, 32,806 (La.App. 2 Cir. 3/3/00), 756 So.2d 583.
To determine that the right to pursue a cause of action based on the Residents' Bill of Rights Law is not heritable would lead to the unacceptable result that if a nursing home resident is negligently injured but survives, a cause of action exists, but if the negligence results in death, the cause of action is lost.
The obvious purpose of the Residents' Bill of Rights Law is to ensure a better quality of life for those in a nursing home. This purpose could be frustrated if the cause of action is terminated upon death of the nursing home resident. Many of these individuals are aged and frail. The nursing home could grievously violate the provisions of the act and when met with a suit, delay the litigation until the resident's death, thus terminating the cause of action and thwarting the purpose of the statute.
To hold the matter is not heritable assails the provisions of LSA-R.S. 40:2010.6 titled "Legislative intent" which states, in part, that "persons residing within nursing homes are isolated from the community and often lack the means to assert their rights as individual citizens." This provision anticipates others will assert the rights of those in the nursing homes. Additionally, LSA-R.S. 40:2010.9 titled "Civil enforcement" provides, in part, that the remedies provided in this action are in addition to and cumulative of other legal and administrative remedies available to a resident.
To hold that the provisions are not heritable would weaken the provisions and thus prevent the accomplishment of the obvious goal of the statute which is to prevent care givers from ignoring the needs of the residents.
I also note that LSA-R.S. 40:2010.9 states the action under the Residents' Bill of Rights Law "may be brought by the resident or his curator, including a curator ad hoc." (Emphasis added.) The use of "may" (as opposed to the mandatory "shall") in this provision permissively allows either the resident, curator, or curator ad hoc to bring a cause of action. The provision does not state that only these individuals can bring the cause of action; rather these individuals are expressly permitted to bring the cause of action. The statute in no way prevents the cause of action from being asserted by others such as a legal successor. LSA-C.C.P. art. 801.
The civil code distinguishes between strictly personal and heritable obligations in Articles 1765 and 1766. Article 1765 states, in part: "An obligation is heritable when its performance may be enforced by a successor of the obligee or against a successor of the obligor." Article 1766 states, in part: "An obligation is strictly personal when its performance can be enforced only by the obligee, or only against the obligor." Thus, what distinguishes the heritable obligation from the strictly personal obligation is who can enforce performance. The general rule is that every obligation is heritable, the exception being when the nature or terms of the contract establish the obligation is strictly personal. See LSA-C.C. art. 1765.
*60 As stated by Professor Saul Litvinoff in 5 LOUISIANA CIVIL LAW TREATISE, THE LAW OF OBLIGATIONS § 4.1, at 63 (1992):
At an early stage Roman law asserted that mortis omnia solvitdeath puts an end to everything, from where the conclusion was derived that the duty of an obligor died with him, as did the right of the obligee. In the time of Justinian, however, that conclusion had already been abandoned and the transferability of obligations to heirs of the parties had been recognized in such an unrestrained manner that no exception was made for obligations to do, the transferability of which presented delicate problems even then.
. . . .
[T]he Louisiana Civil Code states that obligations are transferred to the parties' successors as a general rule but ... recognizes that the parties can make exceptions through the terms of their contract, and it also recognizes that, because of their nature, some contracts give rise to obligations that are not transferred to successors of the parties. The latter are clearly comprised in the category of strictly personal obligations. (Emphasis added. Footnotes omitted.)
Professor Litvinoff and the comments to Article 1766 cite as examples of strictly personal obligations the obligation to fulfill a marriage engagement, the obligation of a musician under contract to record music, and a contract for dancing lessons. Litvinoff at p. 68. Professor Litvinoff also refers to the building of a structure, painting of a portrait, making of a denture, rendering of medical services, posing for a portrait to be used for advertising purposes and the services of an actor based on his appeal as examples of personal obligations. Litvinoff at pp. 66-67.
These examples all represent obligations which could only be fulfilled by the talent of a unique individual, unlike the situation before the court in this matter which involves care provided by the nursing home staff to a group of individuals residing in the nursing home. The obligation to actually provide nursing home services to an individual is a strictly personal obligation. Upon Mrs. Short's death, there is obviously and logically no heritable right to demand a continuation of the personal services by the nursing home. This personal obligation is distinguishable from the right to continue to pursue the cause of action for damages based on a breach of the provisions of the Residents' Bill of Rights Law. This cause of action for damages survives the death and is heritable.
Stated simply, the strictly personal obligation to provide nursing home services to Mrs. Short perished with death; the cause of action related to the inadequacy of the nursing home services survives and is a heritable obligation.
Violation of the provisions of the Residents' Bill of Rights Law relating to medical treatment,[1] is an "offense or quasi offense" which gives rise to "the right to recover all damages for injury" within the meaning of LSA-C.C. art. 2315.1. As such, the cause of action survives and is heritable.
The distinction between a strictly personal obligation and the heritable right to recover damages was recognized by Professor Litvinoff who wrote: "the obligation to repair the damage caused by a failure to perform a strictly personal obligation, as such an obligation to pay damages[,] is heritable." Litvinoff at 69. He cited Johnson v. Levy, 118 La. 447, 43 So. 46 (1907). In Johnson, the Louisiana supreme court succinctly recited the facts:

*61 Plaintiff alleges that in 1901 she became engaged to be married to Lazare Levy, and, whilst so engaged, was seduced by him; that he repeatedly promised to fulfill his engagement, but failed to keep his promises, and, on June 29, 1903, was put in default by formal demand, with which he refused to [comply]; that, thereafter, plaintiff gave birth to a child, issue of her connection with said Levy, and, as a consequence of his refusal to marry her, is condemned to a life of social ostracism, disgrace, and poverty, and is injured and damaged in the sum of $20,000. She alleges that said Levy died on June 29, 1903.[2]
Ms. Johnson brought her cause of action against the siblings of the late Mr. Levy, who had accepted his succession. They responded with an exception of no cause of action "since the action for breach of promise [to marry] is an entirely personal action, and not heritable."
The Court held: "The obligation resulting from a marriage engagement, or promise of marriage, is personal, and not heritable, because no one but the obligee can enforce its performance, and it can be enforced against no one but the obligor."
Nevertheless, the Court went on to hold that although the obligation to fulfill a marriage engagement is a strictly personal obligation, the obligation to respond in damages for breach of that obligation is heritable and may be enforced against the heirs of the obligor.
Similarly, the right to receive services and the obligation to provide services are strictly personal. However, the right to recover damages for injuries due to a violation of the Residents' Bill of Rights Law is heritable.
I further note that before her death, Mrs. Short filed a cause of action based on negligence against the defendant nursing home. Subsequent to her death, the petition was amended to state a cause of action based on the Residents' Bill of Rights Law. Louisiana Code of Civil Procedure article 1153 provides that the amendment relates back to the date of filing the original pleading. Consequently, because suit was filed before her death and the amendments relate back, the cause of action based on the Residents' Bill of Rights Law was properly asserted.
GONZALES, J., concurring in part and dissenting in part.
I respectfully concur in part and dissent in part. I agree that the statutorily created cause of action provided by the Louisiana Residents' Bill of Rights Law is heritable as a survival action under La. C.C. art. 2315.1. Further, I agree that Golden Age's negligence was the cause of the amputation of Mrs. Short's right lower leg. However, I disagree that Golden Age's negligence was the cause-in-fact or legal cause of Mrs. Short's heart attack. Therefore, I would lower the damage award.

CAUSATION
Regarding the extent of Golden Age's liability, there is a reasonable basis in the record to support a causal connection between Golden Age's failure to timely present Mrs. Short for medical treatment before November 12, 1995, and the subsequent amputation of her lower right leg. The trial court's factual findings on this issue are not clearly wrong.
However, there is no reasonable basis for the trial court's determination that Golden Age's negligence was the cause-infact of Mrs. Short's heart attack. According *62 to the medical evidence, Mrs. Short was admitted to the hospital on November 23, 1995, eight days after the amputation surgery, with complaints of chest pain. An electrocardiogram was performed which revealed Mrs. Short had suffered a recent heart attack. At his deposition, Dr. Walker was questioned regarding Mrs. Short's heart attack. He explained that a heart attack was not "an extremely unusual complication" following surgery. Although he declined to state that Mrs. Short's amputation surgery "caused" her heart attack, he testified that the stress of the surgery "clearly could put her at an increased risk for having an acute event like a heart attack, and I believe that is what happened."
Dr. Andrew P. Rees, the cardiologist who treated Mrs. Short, was unable to determine exactly when the heart attack occurred. In his deposition, he testified that his best evaluation was that the heart attack might have occurred at or around the time of Mrs. Short's leg amputation surgery, and that either bypass surgery or amputation surgery can induce enough stress to cause a heart attack. He thought it was "possible" that the amputation surgery led to Mrs. Short's heart attack, and that it was a "reasonable supposition" that both surgeries were a "contributing cause" of the heart attack. However, he also testified that Mrs. Short, who was 69 years old, a longtime smoker, and who had severe peripheral vascular disease, was at a "moderately increased risk" of heart attack independent of the amputation surgery. Notably, although specifically questioned regarding the timing of the heart attack, Dr. Rees would not definitively say that the heart attack probably occurred during or after either of the surgeries or that the heart attack was indeed caused by the surgeries.
An overall review of the evidence indicates the trial court manifestly erred in concluding Golden Age's negligence was the cause-in-fact of Mrs. Short's heart attack. The negligence in this case was Golden Age's failure to timely present Mrs. Short for medical treatment. Whether that delay in treatment led to her heart attack is unanswered in this record. In his reasons for judgment, the trial court stated, "The stress of the two surgeries caused Mrs. Short to suffer her heart attack." However, there is no reasonable basis in the record to support this claim. In his deposition, Dr. Walker assumed the heart attack occurred after the surgeries; however, Dr. Rees, the treating cardiologist, was unable to state when Mrs. Short's heart attack probably occurred. Rather, his opinions regarding the causal relation between the surgeries and the heart attack, even with particular focus on the testimony of Dr. Rees quoted by the majority, were "speculative" and couched more in terms of "maybes" and "possibilities" than "probabilities." This evidence does not amount to a preponderance. The trial court manifestly erred in determining otherwise, and the majority further errs by affirming the trial court judgment on this issue.[1]

*63 DAMAGES
Because I think Plantation Management is liable for damages associated with the amputation of Mrs. Short's lower right leg, but is not liable for damages associated with her heart attack, I think the general damage award should be lowered.
It is clear Mrs. Short suffered considerable pain as a result of Golden Age's failure to timely present her to a doctor for medical attention. Ms. Bullock, Mrs. Short's daughter, testified that, when she arrived at Golden Age on November 12, 1995, to visit, her mother was crying because of pain in her right foot. Upon examining Mrs. Short when she was admitted to the hospital on November 12, 1995, Dr. Walker and Dr. Olinde both noted that she appeared to be in much "distress" and was complaining of pain in her right foot. Dr. Olinde testified that extremely poor circulation to a foot is a very painful condition. Mrs. Short then endured the bypass surgery on November 13, 1995, followed by more pain when the bypass surgery proved to be unsuccessful and, finally, the lower right leg amputation surgery on November 14, 1995. According to Ms. Bullock, following the amputation surgery, Mrs. Short was very depressed, experienced much phantom pain, would not eat, and that she "steadily went down." After her amputation surgery, Mrs. Short remained bedridden until her death in March of 1997.
On the other hand, Mrs. Short was not a well person before problems with her right leg began. Upon her admission to Golden Age, Mrs. Short was 69 years old and had recently undergone hip replacement surgery. It is undisputed that, when admitted, Mrs. Short also suffered from numerous ailments unrelated to her vascular problems, including rheumatoid arthritis, anemia, cataracts, peptic ulcer disease, and osteoporosis. Ms. Bullock contends Mrs. Short was not one to complain and was well on her way to becoming ambulatory again when her leg problem began. To the contrary, Golden Age medical records indicate that Mrs. Short complained of pain regularly and frequently, including complaints of pain all over her body, and pain so great that she could not get out of her bed on occasions. Mrs. Short also suffered from confusion, depression, and sleep problems while at Golden Age. She had limited mobility, ambulated only with assistance, and regularly used a wheelchair.
A significant general damage award is proper for the loss of Mrs. Short's lower right leg. Nevertheless, an award of $650,000.00 is disproportionate to the damages caused by Golden Age's negligence and constitutes an unreasonable amount under the circumstances.
An excessively high award may only be lowered to the highest reasonable amount. *64 I have reviewed recent prior awards for guidance in the assessment of damages in this case, including all cases cited by the parties. See Hebert v. Podiatry Insurance Company of America, 96-567 (La.App. 3 Cir. 10/9/96), 688 So.2d 1107, 1117, writs denied, 96-2726 (La.1/6/97), 685 So.2d 117, 96-2728 (La.1/6/97), 685 So.2d 117. The three most factually similar cases are Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365; Bower v. Jo Ellen Smith Convalescent Center, 96-0388 (La.App. 4 Cir. 1/29/97), 688 So.2d 177; and Williams v. Jefferson Parish Hospital Service District # 2, 604 So.2d 1046 (La.App. 5 Cir.), writ denied, 609 So.2d 260 (La.1992).
In Graham, a 60-year-old man sued a surgeon, claiming the surgeon's failure to promptly call for a vascular surgeon to repair a severed artery resulted in the amputation of his leg at the hip. The surgeon's insurer paid $100,000.00 in settlement before a medical review panel was convened, and Mr. Graham's claim eventually proceeded to trial against the Patient's Compensation Fund. Graham, 699 So.2d at 366. The supreme court concluded Mr. Graham was entitled to damages only for the loss of a chance of saving his leg, rather than to damages for the entire loss of his leg. Graham, 699 So.2d at 372. The Graham court fixed Mr. Graham's damages at $140,000.00, but noted that "approximately $470,000[.00] would have been reasonable for the loss of the leg[.]" Graham, 699 So.2d at 373. In Graham, it was noted that Mr. Graham had a history of severe arteriosclerosis, chronic pulmonary disease, diabetes, hypertension, prior stroke and heart attack, and a forty-year history of smoking. Graham, 699 So.2d at 371.
In Bower, the children of a woman (age unknown) residing in a convalescent home filed suit for damages suffered by their mother before her death. While at the convalescent home, Mrs. Bower developed decubitus ulcers on her head, hip, and both ankles and heels which eventually required the amputation of her right leg below the knee. Bower, 688 So.2d at 178. Prior to admission to the center, Mrs. Bower had a history of arteriolosclerotic disease, cardiac disease, vascular disease, cardiac arrhythmia, deep vein thrombosis, recurring urinary tract infections, multiple strokes, significant organic brain syndrome, severe dementia, and some decubiti. Bower, 688 So.2d at 180. At trial, the jury awarded no damages for Mrs. Bower's pain and suffering and the loss of her leg. Bower, 688 So.2d at 179. The trial court denied motions for judgment notwithstanding the verdict and for new trial. On appeal, the appellate court determined the jury abused its discretion by awarding zero general damages in light of its conclusion that the defendant was negligent and that his negligence caused Mrs. Bower's harm. Bower, 688 So.2d at 179. The appellate court awarded $50,000.00 in general damages for the pain and suffering resulting from Mrs. Bower's decubitus ulcers and loss of her leg. Bower, 688 So.2d at 180.
In Williams, a 67-year-old man lost his lower left leg when a hospital's staff failed to properly monitor pulse readings in his leg during preparation for open heart surgery. Mr. Williams was a very active and self-reliant man who farmed a number of acres. Because of the injury, he was no longer able to drive his tractors or automobile and had to be chauffeured about by his children. He experienced problems in caring for his daily needs and getting about the house. Further, he testified that prior to the surgery, he had problems with his right leg and depended on the strength of his left leg to keep him mobile. Thus, the loss of his left leg had the effect of rendering him almost completely immobile, even with the use of a prosthesis and *65 walker. Williams, 604 So.2d at 1050-1051. Considering all of these circumstances, the fifth circuit concluded an award of $500,000.00 was "on the high side" but not so high as to constitute abuse of the trial court's discretion. Williams, 604 So.2d at 1050-1051.
I have reviewed these cases and have compared and contrasted the pertinent facts with those in the present case. Considering Mrs. Short's particular injuries, I conclude an award of $450,000.00 is the highest reasonable amount which was within the trial court's discretion.
WEIMER, J., writing for a separate majority on the issue of attorney fees.
Plantation Management contends the trial court abused its discretion by awarding Ms. Bullock $238,813.94 in attorney fees. Attorney fees are only recoverable when authorized by statute or contract. Fontenot v. State, Department of Public Safety and Corrections, 625 So.2d 1122, 1124 (La.App. 1 Cir.1993). Louisiana Revised Statute 40:2010.9(A) provides in pertinent part: "Any plaintiff who prevails in such action shall be entitled to recover reasonable attorney's fees, costs of the action, and damages." Thus, the award of an attorney fee by the trial court was validly based on Plantation Management's violation of the Residents' Bill of Rights Law.
The significant sum of $238,813.94 in attorney fees was granted due to the existence of a contingency fee contract between the plaintiff and legal counsel for thirty-three and one-third percent of the total amount of damages collected. In reasons for judgment, the court noted that this type of fee arrangement is customary in personal injury cases and concluded that it was reasonable.
The trial court generally has much discretion in setting an award of attorney fees. While a court's attorney fee award should not be modified on appeal absent a showing of an abuse of discretion, it is not without parameters dependent on the "reasonableness" of a particular sum. This "reasonableness inquiry" applies where attorney fees are established by statute, as well as by contractual agreement. City of Baton Rouge v. Stauffer Chemical Company, 500 So.2d 397, 400-401 (La.1987); Leenerts Farms, Inc. v. Rogers, 421 So.2d 216, 219 (La.1982).
In order to be "reasonable," an award for attorney fees should be based on the services needed to effect recovery, the degree of the professional skill and ability exercised, the volume of work performed, the time devoted to the case, the result obtained, the amount in controversy, the novelty and difficulty of the questions involved, and the percentage fixed for attorney fees in the plaintiff's contract with the attorney.[1]See Malbrough v. Wallace, 594 *66 So.2d 428, 437 (La.App. 1 Cir.1991), writ denied, 596 So.2d 196 (1992). Moreover, courts are not bound by the amount that plaintiff has contracted to pay the attorney. See Simmons v. Board of Commissioners of Bossier Levee District, 624 So.2d 935, 956-957 (La.App. 2 Cir.1993).
We do not believe attorney fees should only be based on the portion of the recovery associated with the Residents' Bill of Rights Law because we cannot practically separate the cause of action based on tort from the cause of action based on the Residents' Bill of Rights Law. The tort cause of action and the Residents' Bill of Rights Law cause of action are so intricately intertwined that these actions cannot be separated. Proof related to one cause of action was congruent with proof related to the other cause of action. The negligent failure to adequately provide medical care caused the injuries and simultaneously violated the provisions of the Residents' Bill of Rights Law.
Under the facts and circumstances of this case and the record on appeal, it was not an abuse of discretion to base the attorney fee award on the one-third contingency fee agreement.
Although the contingency fee agreement is the only factor cited by the trial judge in rendering the attorney fee award, the trial judge had the benefit of presiding over this matter which afforded him the opportunity to become familiar with the work of the attorneys, the complexity of the issues, the effort put forth, and the time invested. Following a trial on the merits, this matter was appealed to this court based, in part, on the heritability of the cause of action under the Residents' Bill of Rights Law, an issue which was res novo at the time the appeal was taken. The substantial award, which was affirmed, reflects an excellent result for the plaintiff.
Based on the judgment, the one-third fee applies even after appeal.[2] This matter required a second appearance in the court of appeal because the case was referred to a five-judge panel.
The attorney fee is a penalty designed to make the plaintiff whole and to aide in preventing neglect or abuse of those confined to a nursing home. Basing the award on what the plaintiff is contractually obligated to pay is a reasonable approach. Because we cannot state the one-third contingency fee was unreasonable vis-à-vis the plaintiff, we cannot say the attorney fee awarded based on the contingency fee contract was an unreasonable method to use in calculating the penalty to be paid by the defendant in this case.
Although a one-third contingency fee does not always constitute a reasonable attorney fee, because time, effort, competency, and complexity must be considered, based on the matters discussed above, we do not believe the trial court abused its discretion in setting the attorney fee.
*67 For these reasons, we affirm the trial court award of attorney fees in the amount of $238,813.94.
GONZALES, J., dissenting.
I dissent from the amount of attorney fees awarded in this case. In my concurrence/dissent to Judge Fitzsimmons' majority opinion, I disagreed with the conclusion that Golden Age's negligence was the cause of Mrs. Short's heart attack. Therefore, I stated the general damage award should be lowered from $650,000.00 to $450,000.00, representing the highest reasonable amount within the trial court's discretion for general damages associated with the amputation of Mrs. Short's lower right leg. A lower damage award also requires a lower attorney fee award. Based on the record in this case, I believe a reasonable attorney fee award would be $150,000.00.
FITZSIMMONS, Judge, dissenting in part with reasons.
I respectfully dissent from that portion of the majority decision that affirms the trial court award of attorney fees. As is noted by the majority, the provisions of La. R.S. 40:2010.9(A) authorize an attorney fee award against the defendant based on Plantation Management's violation of the Residents' Bill of Rights Law. The court's grant of the enormous sum of $238,813.94 in attorney fees erroneously reflects the terms of a contingency fee contract between the plaintiff and legal counsel for thirty-three and one-third percent of the total amount of damages collected, rather than the legal representation by plaintiff's counsel for the Residents' Bill of Rights claims. There is, moreover, inadequate evidence to support the establishment of a particular reasonable monetary sum of attorney fees in compliance with the requisites established by judicial fiat and the provisions of the Louisiana Rules of Professional Conduct.
In the instant matter, there was no evidentiary hearing on the issue of attorney fees. The trial court noted in reasons for judgment that this type of fee arrangement is "customary" in personal injury cases; it thereupon precipitously concluded that it was "reasonable." In groping to determine a fee, the trial court reached for "a number." Such disposition of the issue ignores distinctive, and critical, aspects of this particular case.
The scenario presented in the record of this case epitomizes the court's failure to recognize the prohibition against a lawyer accepting a "clearly excessive fee" (that was erroneously abrogated by fixing the amount of attorney fees as a percentage of the amount to be collected), as well as the axiom that courts are not bound by the amount that plaintiffs have contracted to pay their attorneys. See Ford Motor Credit Company v. Blanchard, 620 So.2d 286, 287 (La.App. 1st Cir.1992); Simmons v. Board of Commissioners of Bossier Levee District, 624 So.2d 935, 956-957 (La. App. 2nd Cir.1993). The trial court inappropriately embraced Mrs. Short's obligation: an obligation to pay a monetary sum, based on the totality of damages collected, pursuant to her contingency fee arrangement executed with her legal counsel. Significantly, the court's review should have been limited to consideration of the sum of attorney fees to be awarded in favor of legal counsel against the defendant.[1] Moreover, the attorney fee award at issue is premised on a violation of the Residents' Bill of Rights; therefore, the *68 award should have pertained only to fees resulting from the defendant's breach of the Residents' Bill of Rights. A fortiori, a contingency fee between a plaintiff and her attorneys for damages pertaining to both the negligence and strict liability claims would exceed the sums related to legal work involving the Residents' Bill of Rights actions, upon which the attorney fees at issue were authorized.
Thus, it is respectfully submitted that the trial court erred in its review of the attorney fee award relative to the merits of all issues in the case and as a result of its singular allusion to Mrs. Short's contractual obligation. The court's flawed consideration of the propriety of attorney fees owed by Mrs. Short for the entire case, rather than those fees to be awarded against Plantation Management, and which are associated only with the Residents' Bill of Rights, constitutes a clear abuse of discretion.
Of equal disturbance is the fact that the record does not contain a detailed presentation of the time or effort expended by legal counsel. Nor does the court indicate that it adequately considered the factors that our jurisprudence indicates are essential criteria. At the commencement of trial, copies of the contingency fee contract and two affidavits were submitted into evidence by attorneys representing the plaintiff. Although relevant in other circumstances, the existence of a contractual arrangement between the plaintiff's attorney and the plaintiff is not even an apposite consideration given the facts and causes of action at issue herein. The two affidavits, which are identical to each other in content, are attached to this dissent.[2] These vague attestations go to various general legal services associated with the pursuit of the entire lawsuit. The cryptic and generic presentation offered on behalf of plaintiff's counsel falls woefully short of satisfying the judicial criterion of "reasonableness" of a particular attorney fee sum. State, Department of Transportation and Development v. Williamson, 597 So.2d at 442.
A court's attorney fee award is not impervious to legal parameters. The existence of abuse of discretion, vel non, in an award of attorney fees is dependent on the "reasonableness" of a particular sum. In the absence of an evidentiary hearing, there has been no demonstration that a particular attorney fee award would be "reasonable," pursuant to such factors as: (1) the services needed to effect recovery; (2) the degree of the professional skill and ability exercised; (3) the volume and character of work performed; the time devoted to the case; (4) the number of appearances made; (5) the result obtained; (6) the amount in controversy; (7) the importance of the litigation; (8) the novelty and difficulty of the questions involved; and (9) the court's own knowledge. State, Department of Transportation and Development v. Williamson, 597 So.2d 439, 442 (La. 1992). These judicially enunciated elements, that are to be taken into account in determining the reasonableness of attorney fees, emanate from, and reflect the content of, Rule 1.5 of the Rules of Professional Conduct.
In circumstances in which the record has not reflected that the trial court held an evidentiary hearing to determine whether or not the contractual amount of attorney fees was reasonable and the services have not been evident from the record, we have previously, in the interest of justice, remanded for an evidentiary hearing. See La. C.C.P. art. 2164; Ford Motor Credit Company v. Blanchard, 620 So.2d at 287. Given the situation before us, the *69 issue of attorney fees should similarly be remanded for further review that comports with settled legal foundations to be considered in the establishment of a "reasonable" award limited to legal work associated with the Residents' Bill of Rights claims. Delineation of the legal efforts expended by plaintiffs' counsel in pursuit of the Residents' Bill of Rights claims should be no more difficult than "reasonableness" inquiries to ascertain an attorney fee sum in other equally complex cases. Somewhere, there still exists the venerable doctrine of quantum meruit. The trial court needs to use that doctrine after review.

*70 AFFIDAVIT

*71 

*72 AFFIDAVIT

*73 
NOTES
[1] In his deposition, Dr. Durwin Walker, Golden Age's Medical Director, described ischemia as decreased blood flow.
[2] The Louisiana First Circuit Court of Appeal, without specifically addressing the issue, has also assumed the heritability of the causes of action provided in La. R.S. 40:2010.9. Overpeck v. Christ Episcopal Church, 577 So.2d 364 (La.App. 1st Cir.), writ denied, 580 So.2d 925 (La.1991), involved the analogous Louisiana Civil Rights for Handicapped Persons Act. Comparing the cause of action presented in Overpeck, involving La. R.S. 46:2251, to the statutes under review sub judice, neither La. R.S. 46:2251 nor La. R.S. 40:2010.6, et seq. specifically provide that the action may be brought by a successor of a handicapped person. In Overpeck, this court applied the survivorship precepts of La. C.C. art. 2315.1 to bestow survivorship of the statutorily enabled actions.
[3] Pericarditis was defined by Dr. Rees as "a condition of the sac which surrounds the heart and provides the purpose of positioning the heart and lubricating the outer portions of the heart so that it can contract smoothly and be mobile in the chest wall."
[4] Myocardial infarction is a heart attack.
[1] See LSA-R.S. 40:2010.8(A)(6) & (7).
[2] Although the date of putting in default and death are the same, whether there was a causative relationship is not explored in the opinion.
[1] Even if the record supported a finding of cause-in-fact in this case, it clearly does not support a finding of legal cause. Whereas the question of cause-in-fact involves a factual determination, the determination of legal cause involves a purely legal question. Todd v. State, Department of Social Services, Office of Community Services, 96-3090 (La.9/9/97), 699 So.2d 35, 39. The legal cause or scope-of-duty inquiry is fact sensitive and ultimately turns on a question of policy as to whether the particular risk falls within the scope of the duty. Roberts v. Benoit, 605 So.2d 1032, 1044 (La.1991). A risk of a particular injury may be found not within the scope of a duty where the circumstances of that injury to that plaintiff could not be reasonably foreseen or anticipated, because there was no ease of association between the risk of that injury and the legal duty. See Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972). Whether phrased in terms of scope of duty or legal cause or proximate cause, it can be useful to consider whether "too much else has intervenedtime, space, people, and bizarreness." See Roberts, 605 So.2d at 1058 (quoting David W. Robertson, Reason Versus Rule in Louisiana Tort Law: Dialogues on Hill v. Lundin & Associates, Inc., 34 La.L.Rev. 1 (1973)).

In my opinion, Golden Age's duty to provide Mrs. Short with adequate medical care of her foot encompassed the risk that a breach of that duty would result in the loss of that foot. However, the risk that she would subsequently have a heart attack did not fall within the scope of that duty because it could not have been reasonably foreseen or anticipated. See Pitre v. Opelousas General Hospital, 530 So.2d 1151, 1162 (La.1988); Paul v. Louisiana State Employees' Group Benefit Program, 99-0897 (La.App. 1 Cir. 5/12/00), 762 So.2d 136.
[1] We note that in a line of cases involving workers' compensation, the courts have stated: "When attorney's fees are awarded in a workmen's compensation case because of arbitrary and capricious nonpayment of benefits, the attorney's fees are deemed to be a penalty, and the value of the attorney's fees need not be proven. Orgeron v. Tri-State Road Boring, Inc., 434 So.2d 65 (La.1983) A trial judge is allowed to call upon his own experience and expertise in determining how much time and effort a lawyer has put into the preparation of the case. Louque v. Jack Eckerd Drug Store No. 523, 405 So.2d 1097 (La.App. 4th Cir.1980)." Levitz Furniture Corp. v. Home, 477 So.2d 824, 828 (La.App. 5 Cir.1985). See also Fontenot v. Town of Kinder, 377 So.2d 554, 561 (La.App. 3 Cir.1979), writ denied, 379 So.2d 1102 (La.1980); Trahan v. Rockwood Insurance Company, 284 So.2d 659, 661 (La.App. 3 Cir.1973); Cain v. Employers Casualty Company, 110 So.2d 108, 110, 236 La. 1085 (La.1959); Daigle v. Great American Indemnity Co., 70 So.2d 697, 705 (La.App. 1 Cir.1954).

The above quoted passage can be traced to insurance cases involving an attorney fee imposed as a penalty. See Brooks v. Liverpool & London & Globe Ins. Co., 144 So. 788, 792 (La.App. 2 Cir.1932); Sigrest v. Federal Ins. Co., 14 La.App. 55, 129 So. 379, 380 (1930).
In Sigrest, the court indicated that the value of the services rendered by the attorney need not be proven by an expert witness, such as another attorney, because the trial judge can determine the value of the services rendered based on the experience and expertise of the trial judge. Thus, although the value of the attorney fee is a relevant consideration, it is not essential to prove the value by expert testimony because the trial court has the relevant expertise.
[2] The contingency fee contract filed into evidence provides for an additional 5% after appeal.
[1] This court does not address what effect payment of attorney fees by the defendant, as authorized by statute, might have relative to attorney fees owed by the plaintiff pursuant to a separate contractual agreement.
[2] The affidavits are identified at trial as P-7.