873 So.2d 755 (2004)
Judy M. THIBODEAUX, As Curator for Her Interdicted Mother, Anna C. Melancon.
v.
STONEBRIDGE, L.L.C. d/b/a Stonebridge Convalescent Center.
No. 03-CA-1256.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
*756 Richard C. Trahant, Kenneth L. Tolar, Metairie, LA, for Plaintiff-Appellant, Judy M. Thibodeaux, as Curator for Her Interdicted Mother, Anna C. Melancon.
Stephen M. Pizzo, Christopher Landry, Blue Williams L.L.P., Metairie, LA, for Defendant-Appellee, Stonebridge, L.L.C. d/b/a Stonebridge Convalescent Center.
Panel composed of Judges JAMES L. CANNELLA, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
Anna C. Melancon (hereafter "Melancon") appeals the damage award in this suit against Stonebridge, L.L.C. d/b/a Stonebridge Convalescent Center (hereafter "Stonebridge"). We amend and affirm as amended.
Melancon, an elderly interdict with Alzheimer's disease and dementia, appears through her curator, Judy M. Thibodeaux (hereafter "Thibodeaux"), who is also her daughter. On May 9, 2001 Melancon was a resident of Stonebridge, a nursing facility. On that date she was injured when a Stonebridge employee ran into her with a metal food cart and knocked her down. Melancon received no medical attention for eight to ten hours after the incident, when she was x-rayed and found to have a broken hip that required surgical repair and post-surgical therapy. Subsequently her health deteriorated. By the time of trial, approximately two years after the accident, she was unable to walk, was confined to a bed and/or a geriatric chair, and had suffered repeated decubitus ulcers.
The case was tried in a bench trial over the course of two separate days (March 18 and April 10, 2003). At the start of the trial Stonebridge stipulated to liability. Hence, the only issue for decision by the court was damages.
*757 Melancon sought special damages for medical bills totaling $261,285.29 and general damages for her hip injury, for her physical problems that developed later, and for the decubitus ulcers. Melancon presented testimony from her daughter/curator, Thibodeaux, and four physicians. The parties presented a number of joint exhibits, consisting mostly of voluminous medical records. Stonebridge called no witnesses.
On May 12, 2003 the trial court issued a judgment in favor of Melancon, with incorporated reasons for judgment. The court awarded Melancon damages in the amount of $236,632.15, consisting of $150,000.00 for general damages and $85,632.15 for special damages.[1] In addition, the court found Melancon entitled to attorney's fees, including interest on the attorney's fees, under the Nursing Home Residents' Bill of Rights law,[2] and to costs. The court awarded $70,000.00 for the attorney's fees and costs, without itemization.[3]
The court rejected Melancon's claims for special damages for hospitalizations in September 2002 and January 2003, as well as her claims for general damages for her decubitus ulcers. The court found Melancon failed to show a causal relationship between those incidents and the May 9, 2001 accident made the basis of this suit.
Melancon has appealed. On appeal she asserts the trial court committed manifest error when it failed to award her certain general and special damages despite unrebutted medical testimony establishing her entitlement to these damages. Melancon contends the trial court's findings regarding these elements of damage are wholly unsupported by the record.

EVIDENCE
Judy M. Thibodeaux
Thibodeaux testified that Melancon was 78 years old at the time of trial. Melancon had been admitted to the Alzheimer's unit at Stonebridge in July 2000 because she had become disoriented, forgetful, apt to engage in unsafe behavior at home, and prone to wander around the neighborhood. According to Thibodeaux, except for the Alzheimer's disease Melancon had no physical problems when she was admitted to Stonebridge. Thibodeaux said Melancon was very active at Stonebridge: "She thought she was at work and she'd help with everyone. She took care of people for the nurses." She had no problems moving around.
On May 9, 2001 at approximately 10:00 a.m., Thibodeaux received a call advising that Melancon had an accident and needed x-rays. Thibodeaux went to Stonebridge, where she found Melancon sitting at a table in the recreation area. Thibodeaux observed that Melancon was in pain; she wouldn't move, but would suddenly start yelling, "Oh, it hurts, don't move me."
*758 Thibodeaux sat at the table with Melancon for hours. No medication was administered to Melancon, who kept crying out with pain. Nursing home personnel eventually moved Melancon to her bed, although she cried about the pain during the process. Thibodeaux was told that paperwork had to be done before Melancon could be taken to the hospital.
Thibodeaux said it was approximately eight hours from the time she was called until Melancon was taken to the hospital emergency room. During that period Melancon was neither seen by a physician nor received any pain medication. Thibodeaux discovered Melancon had sustained a fractured hip, in which the ball of the joint broke off the femur. Melancon underwent surgery by an orthopedic surgeon, Dr. James Todd, the next day.
Melancon was in the hospital for several weeks following the surgery, including time in the rehabilitation area, where she received physical therapy. Thibodeaux said Melancon was in pain both in the post-surgery hospital stay and also during her rehabilitation process.
Thibodeaux said when Melancon was released to return to the nursing home, she was not walking on her own except when someone held her by a strap around her waist. She was in a wheelchair or in bed; when she attempted to get out of either the bed or the chair she was in obvious pain. She did not realize she had had a broken hip. She was supposed to continue physical therapy at the nursing home.
When Melancon returned to Stonebridge on May 25, 2001 she was placed in the skilled nursing facility rather than in the Alzheimer's unit, due to the need for further physical therapy. During the time she was in the skilled nursing unit, Thibodeaux discovered on several occasions that Melancon had been left sitting in her bed in urine, without underwear or diaper. Although Thibodeaux visited Melancon every day, she never observed anyone doing rehabilitation with Melancon. The majority of the time Melancon was just sitting in bed. In addition, Melancon had staples at the surgery site that were supposed to be removed within two weeks, but Thibodeaux noticed that the staples had been left in and skin was almost growing over them. Thibodeaux also noticed that Melancon suffered whenever she moved.
Dissatisfied with the care Melancon was receiving, Thibodeaux removed Melancon from Stonebridge in July 2001 and transferred her to another nursing home, Meadowcrest Living Center.
Thibodeaux said that when Melancon was moved from Stonebridge, she was not walking freely on her own. Thibodeaux said she never saw Melancon using a walker after the surgery while she was at Stonebridge.
At Meadowcrest Living Center Dr. Charles Simonson was assigned to treat Melancon, although Thibodeaux later asked that a different doctor treat Melancon.[4] Thibodeaux testified that Melancon never regained her balance and never was able to walk as she had prior to her hip break. At the time of trial Melancon was unable to stand or walk. Thibodeaux said Melancon still tries to get up to walk, because she doesn't realize she had a broken hip, and they have to stop her. "She'd walk and she'd drag, would have to hold onto something." *759 Thibodeaux was aware that Melancon has fallen several times at Meadowcrest Living Center. She testified that initially at Meadowcrest Living Center Melancon would be placed in a wheelchair or with a walker, but "you could tell by the way she was walking that she should not have been walking." Eventually Melancon began spending more time in bed. Thibodeaux said she only knows Melancon is in pain if she moans; Thibodeaux then will tell the nurses, who will give Melancon medication.
Melancon fell on September 9, 2002 at Meadowcrest Living Center and was taken to the hospital.[5] Thibodeaux said the whole side of Melancon's face down to her neck was bruised and swollen, and her nose was broken. According to Thibodeaux, Melancon was unresponsive to questions so it could not be determined how much pain she felt.
Melancon was in West Jefferson Advance Care, a rehabilitative care center, from September through December 2002, then returned to Meadowcrest Living Center. Thibodeaux said that since then Melancon had gone downhill, was more incoherent, and no longer walked on her own at all. She had a bed sore on her hip and was either in bed or in the geriatric chair all the time.
Dr. James Todd
Dr. James Todd, the orthopedic surgeon who operated on Melancon's hip following her fall at Stonebridge, testified as an expert witness. Dr. Todd said Melancon had a femoral neck fracture in the right hip resulting from her fall on May 9, 2001. He briefly related the procedure for the surgery, which involved removal of the femoral ball, smoothing the area of the fracture, then attaching a prosthesis to replace the ball and repairing the stabilizing soft tissue over the hip.
Dr. Todd saw Melancon one month and one week after her surgery and found that "historically, she was doing quite well." She was able to walk in excess of 100 feet using her walker and she was sitting comfortably in her wheelchair. She had some discomfort on internal and external rotation of the hip, which is one of the complications seen after this type of surgery. She also had chondrolysis (erosion of the acetabulum or cup in which the femoral ball fits), which Dr. Todd believed was what was causing her pain.
Dr. Todd said her hip joint surgery should improve arthritic problems in the area, because making the replacement component fits better more congruent than the ball that has been removed. The surgery not only fixes the hip, but also allows a more comfortable range of motion and more activities. Dr. Todd agreed, however, that due to Melancon's age and injury, it could be anticipated that she would have problems after the surgery. He said common complications following endoprosthetic replacement are chondrolysis or acetabular erosion, dislocation, infection, component loosening, as well as other medical problems associated with surgery in general, such as blood clots, pneumonia, heart attack, and stroke.
Dr. Todd said he last saw Melancon in June 2001, when she was still in her post-surgery convalescent period. He thought she was doing quite well at that time. He had not seen records following her progress since then, so he was unable to discuss her condition after that date.
Asked to review the medical records from Meadowcrest Living Center, Dr. *760 Todd stated that the records noted "repeated patient falls" and "repeated patient injury" and listed dates for a couple of falls. Dr. Todd noted that statistically, a majority of elderly persons who have hip surgery never regain the baseline activity. In addition, there is more of a risk for unfavorable outcome in patients with Alzheimer's.
Dr. Patrick Stumpf
Dr. Patrick Stumpf, an expert in the field of family medicine, testified he treated Melancon from February 1997 until she entered Stonebridge in July 2000. He first suspected she had Alzheimer's in September 1998 and she was diagnosed with Alzheimer's in November 1999. She was in fairly good health for a person her age, other than the Alzheimer's dementia. Dr. Stumpf said Alzheimer's disease is a condition where the cognitive functions of the patient's brain are impaired, leading to loss of ability to concentrate, loss of memory, and things of that nature. In some patients it can lead to loss of ability to ambulate.
Dr. Stumpf was not aware of any problems with Melancon's hip while she was his patient. During the three-year period in which he treated her, there was only one report of a fall, when Melancon tried to climb into a baby bed and it collapsed. Dr. Stumpf said he received a telephone call about the incident and was told she sustained a gash in her leg, but she was not brought to see him.
Dr. Stumpf stated that having Alzheimer's does not place a patient at particular risk for falling, nor does it mean the patient's general health is going to deteriorate quickly. He has seen many Alzheimer's patients who remain healthy for a long time. He said Alzheimer's is a progressive, incurable disease and in many cases leads to the patient being unable to ambulate, even where the patient has not had hip fracture or problems with other broken bones.
Dr. Stumpf said Melancon had large calluses on the bottom of her feet that impaired her walking at times. However, he did not recall her having problems walking. He agreed that an elderly patient with moderate-to-severe Alzheimer's who becomes non-ambulatory as the disease progresses could develop pressure sores. He said anyone who becomes non-ambulatory for any reason is prone to develop pressure sores, if they're not turned and mobilized on a regular basis. On the last occasion he saw Melancon, to fill out the form for her admission to Stonebridge, she had a lesion on the bottom of her left foot; however, he did not know what caused it.
Dr. Michael Russo
Dr. Michael Russo, an expert family practice physician, first treated Melancon in August 2000 when she was a resident of the Alzheimer's unit at Stonebridge. At that time, other than Alzheimer's, she had an easily reducible hernia, and some peripheral vascular disease, but otherwise was fairly functional for a person of her age. Her only problems were those normal for a 76-year-old woman. He did not note her to be a particular fall risk. She had some mild arthritis, but no major problems. At one point between her admission to Stonebridge and the accident in May 2001, she developed pneumonia, but otherwise was "pretty healthy."
Dr. Russo said that Stonebridge personnel called him when the accident with the food cart occurred. He told them to arrange for x-rays. The Stonebridge records indicate the accident occurred at 8:45 a.m. He admits it was nine hours and 50 minutes before Melancon was admitted to the emergency room. He admits that her medical record does not indicate she was given any pain medication during that entire *761 time, but says no nurse informed him that Melancon was in excess pain. He said that if the patient is in pain, usually a nurse will call and request a pain medication.
Dr. Russo admitted that in Melancon's situation it was an "abhorrent" amount of time for someone with a broken hip to be deprived of any type of pain management. He said he was called about Melancon two times that day: once that she'd fallen, when he ordered x-rays; the second time when he was informed that the x-rays showed she had a broken hip and he gave the order to send her to the hospital emergency room. He said if he had been alerted to the fact she was in pain, he would have ordered medication for her.
Dr. Russo said that broken hips are a cause of morbidity in older patients, that an elderly person who has had a broken hip usually goes into a downward spiral, and that even when they do well after the surgery, they still suffer long-term problems. He could not recall any patient he has ever treated over the age of 70 who had a broken hip and surgery and made a full recovery. He stated, "It's usually a major setback in their progression."
Dr. Russo said he last saw Melancon fairly close to the time of the accident, after which she passed out of his care, and he was unable to say what happened to her after that. He said that during the time he was treating Melancon, her Alzheimer's was relatively stable in the moderately advanced stage. He noted that Alzheimer's primarily starts with recent memory disturbances and eventually progresses to problems with bowels, bladder, ambulation, and appetite. People stop eating and become less mobile and eventually become bed-bound. He's seen patients do that even without hip fractures. Once they become non-ambulatory they are more prone to development pressure sores, simply because of immobility.
Dr. Russo testified that Melancon was treated for pneumonia in November 2000 and again in March 2001, which was probably a recurring infection. Asked how pneumonia affects a 76-year-old Alzheimer's patient, Dr. Russo says physical strains can make deterioration more rapid. His review of the records for Melancon's March 15, 2001 treatment indicates she was in delirium pneumonia and was place under "supervised sedation," but he says it's very unusual to sedate someone who is in respiratory distress, unless the person is out of control in their behavior. That would be a serious medical condition.
Dr. William Long
Dr. William Long, an expert in the field of family practice, testified he treated Melancon beginning in November 2002 at Meadowcrest Living Center and was still her treating physician at the time of trial. She was doing relatively well on his first visit with her, although she was apparently bed-bound. She had recently been released from the Advance Care unit at West Jefferson Hospital after having had treatment for a pressure sore on her ankle, which required a skin graft. It was a Stage IV decubitus ulcer, which is as bad as such a sore can be.
Dr. Long said decubitus ulcers are related to the patient's being on a particular area for too long a time. They develop pressure over bony areas, which compromises the circulation; eventually, the skin breaks down and forms ulcers, commonly known as bed sores. The fact that Melancon had developed these ulcers indicated she had been immobile for a period of time. The Meadowcrest Living Center records had no notation of the first three stages of the development of the ulcer that required the skin grafting.
*762 However, Dr. Long said, the Meadowcrest Living Center records show there was concern about Melancon's mobility and ambulation when she was admitted. In addition, there are notes indicating the possibility that Melancon may had falls or injuries during the period between her admission to Meadowcrest Living Center and when Dr. Long began seeing her. There also is a note that in April 2002 Melancon was "totally in wheelchair."
Dr. Long said these possible falls, injuries, and immobility would be contributed to by Melancon's hip surgery. In addition, notes regarding Melancon's pain establish she was still having pain due to the left hip arthroplasty five months after the surgery. The notes indicate that in April 2002 Melancon was most in a wheelchair, but was able to ambulate at times without assistance. A note in May 2002 indicated that Melancon required maximum assistance with activities of daily living, which would include bathing, brushing her teeth, cleaning herself, and eating; in addition she ambulated per wheelchair and walked without it at times.
Dr. Long agreed the hip fracture would make Melancon less mobile and it was more probably than not a causative factor in the immobility that resulted in the decubitus ulcers. He said it also was more probable than not that the hip surgery contributed to Melancon's declining physical condition. He admitted he would be surprised if an elderly patient of Melancon's age who recovered fully from hip surgery without any adverse effects.
On cross examination Dr. Long testified that Alzheimer's usually causes problems with memory and behavior, but can begin to cause problems with bowel and bladder incontinence, problems getting around and ambulating, and can lead to disorientation, confusion and agitation. In severe cases it will progress to the point where the patients are non-ambulatory. Such patients become bed-ridden and are more prone to develop decubitus ulcers.
Questioned about various notes throughout the Meadowcrest Living Center records, dating back to when Melancon was first admitted there, Dr. Long stated they indicate Melancon was able to move about and ambulate without assistance through April 2002. He said anytime somebody elderly has had a fractured hip and has Alzheimer's, there are going to be some problems in the future, even if the person is able to get up and move. The fracture will still contribute to difficulties with mobility. The patient is not going to get back to the same level as before she broke her hip. He felt both the Alzheimer's disease and the hip fracture contribute to Melancon's being non-ambulatory.
Meadowcrest Living Center Records
The medical records from both Stonebridge and Meadowcrest Living Center, from the time Melancon returned to Stonebridge until Dr. Long assumed her care in November 2002, indicate that Melancon was ambulatory by July 17, 2001. The notes document that Melancon had episodes of wandering and that she had a WanderGuard monitoring bracelet placed on her so the staff could track her whereabouts. She had a fall on September 24, 2002 that left her with an unspecified decline in her physical health; the note indicates a decline in wandering and decline in social interaction.
The MDS (Minimum Data Set) information sheets appearing at intervals in the records indicate a gradual decline in Melancon's ability to move around and care for herself. On July 17, 2001 she required no help from staff to move around in her bed, to transfer from bed to chair to wheelchair or standing position, to move around in her room or in the corridor, and to use the toilet. She needed some help *763 with eating and personal hygiene and help in getting dressed. The MDS noted she did not use any assistance to ambulate.
The MDS dated October 16, 2001 showed that Melancon required supervision for walking in room or corridor or around the unit and in eating. She required limited assistance with dressing, toilet use and personal hygiene.
The MDS of January 17, 2002 showed Melancon was beginning to require supervision and a person to assist her with walking in her room, the corridor, and around the unit.
The MDS dated April 16, 2002 indicated Melancon was still independent with bed mobility, but now required limited assistance with all other activities except toilet use, for which she was totally dependent.
Curiously, the MDS dated July 16, 2002 indicated that Melancon was still independent with bed mobility, but required only supervision for walking in her room and the corridor, that she still required limited assistance with other activities, and still totally dependent for toilet use. It indicated she did not use any assistance (walker, etc.) while walking.
The MDS on September 22, 2002 indicated Melancon continued to be totally dependent for toilet use, totally independent for bed mobility, required one person to assist her with moving from bed to chair, etc., to move around the unit, to dress, to eat, and with personal hygiene. There was a notation that Melancon did not walk in room or in corridor during the past seven days and that the wheelchair had become her primary mode of transportation.
None of the MDS forms mention any formation of decubitus ulcers. This indicates a lapse in the note-taking procedure, because it is documented that Melancon had to be removed from Meadowcrest Living Center for treatment of a Stage IV decubitus ulcer from September to December 2002.
We note, separately, the time gap in physician testimony between Dr. Russo and Dr. Long. After Melancon was moved to Meadowcrest Living Center, she was treated by Dr. Charles Simonson from approximately July 2001 until November 2002, when Thibodeaux requested a different physician. The reason for the request was that Thibodeaux had learned that Dr. Simonson was the medical director not only of Meadowcrest Living Center, but also of Stonebridge, and by then Melancon was engaged in litigation with Stonebridge. Neither party called Dr. Simonson to testify.

ACTION OF THE TRIAL COURT
In the reasons for judgment, which were included within the judgment, the trial court set out the following analysis of Melancon's general damages:
The Court heard testimony and reviewed the medical records filed as evidence and does find that plaintiff is entitled to general damages in the amount of $150,000.00. Most compelling to this Court was the testimony and documentation of the way plaintiff was treated by the defendant immediately after the accident, in particular the fact that she did not receive medical treatment for a period of eight to ten hours.
It is important to note that in assessing general damages this Court reviewed the entire record and evidence submitted and noted that the purpose for Mrs. Melancon's admittance into a convalescent home was to prevent her from harming herself and others as well as her failing health. Mrs. Thibodeaux, plaintiff's daughter, testified her mother was in the habit of wandering out of her residence and into neighboring areas.

*764 There was also testimony that Mrs. Melancon injured herself climbing into a baby's crib. Basically, and unfortunately, Mrs. Melancon is on a downward spiral and it becomes difficult to effectively prove a causal link from a past accident and occurrence to a present condition. In addition to the dementia related to Alzheimer's, Mrs. Melancon constantly battled upper respiratory problems as well as other health issues throughout her admittance to Stonebridge Convalescent and the Meadowcrest Living Center.
The trial court found Melancon was entitled to special damages for the admission and associated costs of Meadowcrest Hospital, as well as the professional charges of Dr. Todd and the cost of rehabilitation warranted by the accident of May 9, 2001. The total for those three items was $85,632.15.
The other bills consisted of $8,277.65 to Meadowcrest Hospital for treatment of injuries from a fall on September 9, 2002, $152,839.49 to West Jefferson Advance Care for treatment of a decubitus ulcer on Melancon's ankle, and $14,536.00 to West Jefferson Medical Center for treatment of a decubitus ulcer on Melancon's left hip. In denying any awards for these items, the court stated:
The records from Meadowcrest Living Center indicate that the plaintiff was found lying on the floor in another resident's room injured. The plaintiff could not advise what occurred and there were no witnesses identified in the records.
It was documented that plaintiff, due to her mental state, had a habit of wandering and being abusive to other residents and staff of Meadowcrest Living Center. It was documented that plaintiff wandered to the extent that the staff had to put an instrument on her to record her movements. It was also recorded that plaintiff would go into other residents' rooms and handle their belongings. The Court further took notice of the testimony of witnesses in the trial who stated the plaintiff made a remarkable recovery from the injury ... of May 9, 2001.
For the foregoing reasons, this Court finds that the plaintiff failed to show a causal link between the accident of May 9, 2001 and the injury and treatment as a result of the occurrence of September 9, 2002.
With regard to the medical bills arising from Melancon's admission to West Jefferson Advance Care on January 8, 2003, the court found:
A review of these records show plaintiff was transported from Meadowcrest Living Center to West Jefferson Advance Care after she was found lethargic by Meadowcrest Living Center staff. The diagnosis provided by the treating physician was that the plaintiff was suffering dehydration and malnutrition. A decubitus ulcer was also treated while admitted for the main illness.
The Court finds that the plaintiff failed to show a causal link between the accident of May 9, 2001 and plaintiff's subsequent dehydration and malnutrition. In fact the Court heard testimony that these types of illnesses were associated with Alzheimer's.
Finally, with regard to the assertion that several decubitus ulcers from which Melancon has suffered are related to her 2001 hip injury, the court found:
Plaintiff also requested the court to consider the development of decubitus ulcers as a result of plaintiff's lack of ambulation due to the accident of May 9, 2001. A reading of the medical records submitted as evidence shows that the plaintiff had a decubitus ulcer prior to *765 the accident of May 9, 2001. A decubitus ulcer was noted on her medical chart prepared by Dr. Russo and sent to Stonebridge Convalescent Home by fax on December 11, 2000. In addition records showed plaintiff ambulated frequently, to the point that the home had to put a monitoring device on her to keep track of her. This Court also heard testimony that these ulcers were a common occurrence in plaintiff's condition with the illnesses she suffered.
In regards to the decubitus ulcers, plaintiff has failed to establish causation to the accident of May 9, 2001.

LAW AND ANALYSIS
Melancon points out that, contrary to the trial court's statement in the reasons for judgment, none of the witnesses ever said that Melancon had made a remarkable recovery. The judge's statement that witnesses said Melancon had made a "remarkable recovery" was clearly wrong; no witness said that or anything close to it.
Melancon points out that Dr. Long's unrebutted medical testimony linked the decubitus ulcers to the hip injury and that Stonebridge called no medical witness to controvert Dr. Long's opinion. According to Melancon, she has incurred nearly $170,000.00 in medical costs for treatment of the decubitus ulcers alone, outside of Meadowcrest Living Center, and Dr. Long related these to her broken hip.
Melancon also contends that the trial court committed manifest error in failing to award her greater general damages, because the court ignored unrebutted testimony establishing her right to such damages. First, Stonebridge left her without medical care or pain medication for a period of 10 hours before she was taken to the emergency room and during that period she was screaming in pain. Second, she contends the immobility caused by her failure to return to her former state of health after the hip surgery cause her to suffer "gruesome and disfiguring" decubitus ulcers for which she has required extensive treatment.
Melancon contends that unrebutted, uncontradicted or unrefuted medical testimony must be accepted by trial courts as conclusive of establishing medical causation, even in situations where the unrebutted medical testimony conflicts with the testimony of lay witnesses. Likewise, Melancon argues, trial courts are not permitted to disregard unrebutted medical testimony in limiting a Melancon's damages when the testimony compels the award of greater damages.
A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993). The defendant is liable for the harm it causes even though under the same circumstances a normal person would not have suffered that illness or injury. Lasha, 625 So.2d at 1006.
When the defendant's tortious conduct aggravates a pre-existing condition, the defendant must compensate the victim for the full extent of the aggravation. Id. A tortfeasor is liable not only for the injuries which he causes directly to the tort victim, but also for additional suffering caused by inappropriate medical treatment. Id. The defendant is liable for the aggravation during treatment of plaintiff's injuries, even where such aggravation is due to the negligence of another, so long as plaintiff exercised reasonable care in selecting those in whose care he placed himself. Id.
Thus, when there is no evidence that a plaintiff was at fault in placing himself in physicians' care, the trial court commits legal error in denying plaintiff recovery *766 from the defendant based on the theory that his subsequent injury was caused by a source different than the original tortfeasor.
"There can be, and frequently is, more than one cause of a particular injury. A party's conduct is a cause-in-fact of harm to another whenever it is a `substantial factor' in bringing about that harm." Saden v. Kirby, 94-0854 (La.9/5/95), 660 So.2d 423, 428.
A trial court's finding of fact may not be reversed absent manifest error or unless clearly wrong.... The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one..... Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. [Citations omitted.]
Miller v. Clout, 03-0091, p. 6 (La.10/21/03), 857 So.2d 458, 462.
With respect to the amount of damages awarded, however, the standard is not manifest error, but abuse of discretion:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.
Miller, 03-0091 at p. 7, 857 So.2d at 463, quoting Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993).
We conclude the trial judge was clearly wrong in basing the general damage award on his belief that Melancon had made a "remarkable recovery," as noted above. As detailed in the factual section of this opinion, Melancon did not make a remarkable recovery; rather, from the time of the accident her condition began a marked downward spiral. It is true, as the judge noted, that Melancon's pre-existing Alzheimer's disease and other pre-existing conditions make it impossible to prove her subsequent problems were solely the result of the accident made the basis of this suit.
Nevertheless, it is well established that "a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991).
At trial of this matter Melancon was unable to speak for herself to describe her injuries or to inform the court of the pain she suffers and the disability that remained and increased after her surgery. She is part of that growing portion of our populace sliding into a deepening twilight in their last years, those for whom others must be their mouthpieces. Locked within their own minds, these citizensour grandparents, our parents, someday ourselvesmust depend on others to sense the needs they cannot express for themselves. Confused and sometimes agitated, in their minds their world is different from our reality. They must rely on others to interpret their sometimes contradictory, sometimes bizarre behavior, and they need others to protect them.
The trial court erred in holding that Melancon's "downward spiral" could not be *767 effectively proven to have a causal link to the accident on May 9, 2001. In fact, none of the physicians who testified said or even implied that Melancon had recovered from her hip injury. We believe the subsequent falls she suffered were not separate intervening causes of her problems, but rather resulted from the weaknesses created by the original fall.
Accordingly, we find the trial court abused its discretion in the amount awarded as general damages. The effects of Melancon's severe hip fracture lasted beyond the initial recovery period. Although ultimately her Alzheimer's disease would have resulted in loss of the ability to walk, nevertheless we find it clear that her hip injury accelerated that process, as well as producing greatly increased suffering.
Taking into account all the factors, including Melancon's age when the accident occurred; the length of time she was hospitalized; the surgical procedures; the length of time she was bedridden; her total recovery time, especially considering that she never regained her former statement of health, but rather continued declining, we find that the lowest reasonable amount of general damages that should have been awarded was $400,000.00. See Southern v. Lyons, 97-19, p. 7 (La.App. 3 Cir. 5/28/97), 696 So.2d 128, 132-133, writ denied 97-1729 (La.10/13/97), 703 So.2d 617.

ATTORNEY FEES
This suit was brought not only in tort but also under the Nursing Home Residents' Bill of Rights Law (henceforth, "NHRBRL"), La.R.S. 40:2010.6-40:2010.9. La.R.S. 40:2010.9 permits civil enforcement of the law and allows the injured party to recover not only damages but also attorney's fees from the defendant nursing home. As noted previously in this opinion, the trial court awarded $70,000.00, which the court stated was for both attorney's fees and costs.
Melancon asserts that if this Court increases the damages award, the attorney's fee award should be increased proportionately. Even if there is no increase in the damages, however, Melancon complains that the amount awarded was significantly less than the amount provided in the contingency fee contract, although the trial court indicated it was relying on the contract.
The contingency fee contract provides for a fee of thirty-three and one-third percent any settlement, award, compromise or other recovery if the matter is concluded prior to filing suit and for a fee of forty percent of any settlement, award, judgment, compromise or other such recovery obtained during or after any trial or appeal.
Melancon points out that subtracting the recoverable costs ($6,798.73) from the trial court's combined attorney's fees/costs award ($70,000.00) would leave her with an attorney fee of $63,201.27, far lower than the amount her attorney is entitled to recover under the contingency fee contract.
In Short v. Plantation Management Corporation., 99-899, pp. 32, 34 (La.App. 1 Cir. 12/27/00), 781 So.2d 46, 65, 66, an action against a nursing home alleging negligence and violations of the NHRBRL, the first circuit affirmed the "significant sum" of $238,813.94 in attorney fees, based on a 33-1/3% contingency fee contract between the plaintiff and her counsel.[6] The court ruled that the award of attorney fees was reasonable, where there was a general *768 damages award of $650,000, the contingency fee contract provided for 33-1/3% of total amount of damages collected, and the causes of action were intricately intertwined, in that the defendant's negligent failure to adequately provide medical care caused the plaintiff's injuries and simultaneously violated the provisions of the NHRBRL.
Here, as in the Short case, the causes of action are intricately intertwined. Stonebridge's initial tortthe injury to Melancon through its employee's negligencewas compounded by the lengthy delay in getting her pain relief and treatment for her injury. Those actions also were simultaneous violations of the NHRBRL.
We find the trial court abused its discretion in reducing the attorney's fee award so drastically from the percentage stated in the contingency fee contract. As stated in Short, "The attorney fee is a penalty designed to make the plaintiff whole and to aide in preventing neglect or abuse of those confined to a nursing home. Basing the award on what the plaintiff is contractually obligated to pay is a reasonable approach." Short v. Plantation Management Corp., 99-0899 at p. 34 (La.App. 1 Cir. 12/27/00), 781 So.2d at 66.
Considering the increase in damages we award, the new gross amount of the judgment is $492,430.88. We have reviewed the record in light of the factors courts must consider in determining attorney's fees and we find that $150,000.00 is an appropriate amount.[7]

DECREE
For the foregoing reasons, the judgment is amended to increase the general damages award to $400,000.00, making the total amount awarded for damages $485,632.15 and to award attorney's fees in the amount of $150,000.00. As amended, the judgment is affirmed. The defendant-appellee, Stonebridge, L.L.C. d/b/a Stonebridge Convalescent Center, is cast with all costs for the trial and the appeal.
AMENDED AND AFFIRMED AS AMENDED.
NOTES
[1] The $1,000.00 discrepancy between the sum of the two damages awards ($235,632.15) and the total listed in the judgment ($236,632.15) apparently is an error in calculation or addition, but Stonebridge has not sought review of it.
[2] La.R.S. 40:2010.8 and 40:2010.9.
[3] One month after the judgment was rendered, Stonebridge made an offer of judgment in the amount of $311,102.08 and Stonebridge deposited the funds into the registry of the court. Melancon subsequently filed an ex parte motion to withdraw the funds from the court registry. There was some skirmishing because Stonebridge wanted the judgment clarified to specify the amount attributable to costs and the amount attributable to attorney's fees, but apparently that dispute was resolved. Stonebridge has stated in pleadings and in its appellate brief that it is satisfied with the judgment in the amount of $311,102.08.
[4] Some time after this lawsuit was instituted, Thibodeaux learned that Dr. Simonson was the medical director of both Meadowcrest Living Center and Stonebridge. She asked that Melancon be treated by a different doctor because of the apparent conflict of interest due to this suit against Stonebridge.
[5] "The hospital" refers to Meadowcrest Hospital, a different entity than Meadowcrest Livin Center.
[6] The case was decided by a five-judge panel in which three members disagreed on various issues, resulting in a majority opinion on liability authored by Fitzsimmons, J., and a separate majority opinion on the issue of attorney's fees authored by Weimer, J.
[7] Those factors are: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal services properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment would preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and the length of time of professional relationship with the client; (7) the experience, reputation and ability of the lawyer or lawyers performing the service; and (8) whether the fee is fixed or contingent. City of Baton Rouge v. Stauffer Chemical Co., 500 So.2d 397, 400 (La.1987).